## S & S BUILDING CORPORATION *v.* FIDELITY STORAGE CORPORATION

[No. 43, September Term, 1973.]

*Decided November 6, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Douglas G. Worrall*, with whom were *Smith, Somerville & Case* and *Thomas B. Yewell* on the brief, for appellant.

*Hal C. B. Clagett*, with whom were *James P. Salmon* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Failure on the part of appellant, S & S Building Corporation (S & S), to provide a warehouse with a sprinkler system "in compliance 100% with Maryland Fire Rating Bureau requirements" was the basis of a judgment in favor of appellee, Fidelity Storage Corporation (Fidelity), against S & S in the amount of $152,418.68. We shall affirm that judgment.

On July 7, 1970, S & S and Fidelity entered into an agreement called a lease. S & S was to build a warehouse for Fidelity in its Hanson-Beltway Industrial Center. This was to be constructed according to plans and specifications to be approved by both parties and then attached to the lease agreement. This included a requirement:

> "Sprinkler system should be dry system, must be in compliance 100% with Maryland Fire Rating Bureau requirements and must extend into office and driver's area."

The lease was to be for a term of twenty (20) years beginning "on the first day of the month following the actual date of 'occupancy,' (but in no event prior to April 1, 1971)." The agreement said it was anticipated that the term of the lease would begin on or about April 1, 1971, "unless commencement of the term [should] be postponed ... as [t]hereinafter provided." " '[O]ccupancy' [was] defined as receipt by [Fidelity] of a Certificate of Occupancy from the appropriate governmental authority of Prince George's County, for a warehouse, for the storage of household goods, and office space, after prompt and proper application by [Fidelity] therefor." The agreement provided that if possession were "not tendered to [Fidelity] in such condition that an occupancy permit [could] be obtained for the purpose [previously] set forth ... on or before June 1, 1971, [Fidelity should] have the right and option to cancel [that] Lease . . . ." Fidelity was to "have the right to use the premises in advance of completion and before 'occupancy,' provided such use [did] not interfere with completion of the Building." If an occupancy permit were issued on a day other than the first day of a calendar month, then Fidelity was to pay from that date a pro-rata portion of the monthly rent. The agreement spelled out that the criteria in it represented "the elements necessary for the approval of a warehouse by the United States Government." A large part of Fidelity's business is the storage of household goods of military personnel moving from one station to another.

Fidelity moved in its equipment and began accepting storage on June 25, 1971. As S & S puts it in its brief, "For reasons not here relevant and at the agreement of both parties the lease term commenced July 1, 1971." The certificate of occupancy was issued July 2, 1971.

When S & S brought suit for rent for two months which it said was due, Fidelity filed a counterclaim for lost income. At trial before a jury the parties stipulated as to the back rent. Fidelity then went ahead to prove its counterclaim. S & S rested at the conclusion of Fidelity's case. It made a motion for a directed verdict, but presented no evidence. The jury returned a verdict of $18,068 in favor of S & S against

Fidelity and a verdict of $170,486.68 in favor of Fidelity against S & S. A motion by S & S for judgment *n.o.v.* was denied. At that time, judgment was entered in favor of Fidelity against S & S for the net amount of $152,418.68.

S & S claims (1) Fidelity failed to prove a breach of the terms of the lease, (2) Fidelity failed to prove legally recoverable damages, and (3) that the trial court committed prejudicial error in admitting into evidence (a) two letters received by Fidelity from the Department of Defense, (b) testimony relative to business conducted in Virginia, and (c) testimony as to the effect of a letter from Mr. Schoolfield of the Fire Underwriters Rating Bureau upon the business of Fidelity. We shall develop additional facts in the process of discussing the points raised.

I

There is no dispute about the fact that the sprinkler system did not meet the standards required until September, 1971. S & S argues that for Fidelity "to sustain its assertion that S & S was in breach of contract, Fidelity must show that S & S was obligated to and could have achieved that goal earlier." It points out that the lease did not specify a required completion date nor state that time was of the essence of the contract; that Fidelity had an option to cancel if possession was not tendered by June 1, 1971, which option was never exercised and which was not to be effective if the delay was caused by circumstances beyond the control of S & S; that the term of the lease was predicated upon "occupancy"; that the sprinkler system was installed in the building and had been functioning for some time prior to the issuance of the occupancy permit on July 2; that the sprinkler system had been approved by the fire marshal on June 16; that a rating by the Rating Bureau by occupancy date was impossible since it would make no inspection until occupancy was established and until an inspection was made the required test could not be performed or reported; that since time was not of the essence and there was not a fixed completion date the parties are left to what is reasonable under the

circumstances and "the evidence leads to the only conclusion that S & S acted in a reasonable and, in light of normal delays in construction, in a very prompt manner."

When Mr. Schoolfield of the Maryland Fire Underwriters Rating Bureau made his inspection on July 14, 1971, he found a number of defects. One of the most serious was the presence of valves not approved by the Underwriters' Laboratories. John C. Livingstone, Jr., president of the corporation which installed the sprinkler system, testified as to a meeting on the job site in the spring of 1971. Livingstone desired that certain changes be made, partially for his convenience. He said:

> "I pointed out to the plumber during that meeting the valves in the — the valves were not U. L. approved and the underwriters would not approve the installation as it was, in my opinion. It had been my experience in the past that all valves in the fire line were required to be underwriters approved, and that these valves were not."

In response to a question, he stated specifically that at the time of his conversation with the plumber those who were present and overheard the conversation with the plumber included the superintendent for the prime contractor and the architect. The architect was the agent of S & S. Livingstone further stated that it was these same valves that were later replaced at the direction of Mr. Schoolfield.

The premises had been tendered by S & S to Fidelity as of July 1 as meeting the terms and specifications of the lease agreement. It was at that time that the lease became operative. It would serve no useful purpose to prolong this opinion by setting forth other defects found by Schoolfield. The important point is that a specific requirement of the lease was that the sprinkler system "be in compliance 100% with Maryland Fire Rating Bureau requirements," and there was uncontradicted evidence before the jury to the effect that it was not. S & S knew from the lease itself that the criteria of the U. S. Government would be involved. Accordingly, it knew of the necessity for "dotting its i's and

crossing its t's." Under the circumstances to tender a structure as completed when the sprinkler system was deficient would be in about the same category as tendering as complete an office structure or apartment building in which the heating plant had not been installed. Therefore, there was sufficient evidence to go to the jury.

## II

S & S argues long and hard that the claim of Fidelity is for loss of income, which it is, and that to establish its claim "Fidelity has the burden of establishing not only a breach of contract proximately causing such lost income, but in addition, that S & S could have reasonably foreseen that such lost income would be a probable result of the breach and that the lost income be proved with reasonable certainty."

In its motion for directed verdict S & S claimed that Fidelity had proven no damages. In Maryland for every breach of contract there is a right of recovery of at least nominal damages. *Asibem Assoc., Ltd. v. Rill,* 264 Md. 272, 276, 286 A. 2d 160 (1972); *Gilbert Const. Co. v. Gross,* 212 Md. 402, 412, 129 A. 2d 518 (1957); and *Wlodarek v. Thrift,* 178 Md. 453, 461, 13 A. 2d 774 (1940).

S & S enlists the aid of our opinion in *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 246, 278 A. 2d 12 (1971), where we adopted the opinion of the trial court in which it was said that lost profits of a new business could not be recovered because they were too uncertain to form a basis for recovery. Unfortunately for S & S, however, it requested no instruction to the jury to that effect. In fact, S & S made no request for instructions to the jury. It likewise took no exception to the instructions given. If it had any objection to the instructions as given or desired additional instructions, then under Maryland Rule 554 d it was obliged to make its objections known before the jury retired. Not having done so, the point is not before us for review. Rule 554 e.

## III

### a.

S & S claims reversible error on the part of the trial judge in overruling an objection to the admissibility of two Department of the Army letters which referred to the classification of Fidelity's warehouse for storage purposes as of certain dates. Testimony to exactly the same effect came in without objection. If we assume, without deciding, that the evidence was inadmissible, any objection to its admissibility was waived by its subsequent admission without objection. *Spriggs v. Levitt & Sons, Inc.*, 267 Md. 679, 683, 298 A. 2d 442 (1973), and cases there cited.

### b.

As a part of its case Fidelity from time to time referred to its warehouse in Virginia which carried on an operation similar to that intended for the warehouse in the case at bar. Two of the officers of Fidelity testified, over the objection of S & S, as to the business at the Virginia facility in 1970 and 1971 and the business in the Maryland facility for comparable months in 1972. S & S sees prejudicial error in the admission of this evidence.

On the second occasion of an attempt to bring in this information there was an objection which was sustained in part. New questions were framed which elicited the information in detail as to the Virginia operation in 1970 and 1971 and the Maryland operation in 1972. No objection was interposed. The preceding objection was not applicable. *Baltimore & O.R.R. v. Plews*, 262 Md. 442, 470, 278 A. 2d 287 (1971). Counsel must bear in mind the admonition of Judge Prescott for the Court in *State Roads Comm. v. Bare*, 220 Md. 91, 151 A. 2d 154 (1959):

> "Rule 522 d 2 reads that '[e]very objection to the admissibility of evidence shall be made at the time when such evidence is offered, or as soon thereafter as the objection to its admissibility shall have become apparent, otherwise the objection shall be

treated as waived.' The committee's note states: 'Counsel are cautioned that in the light of the Court of Appeals construction of its former Rule 17, which is the foundation for Rule 522, a ruling of the court must be obtained upon each objection, in order to lay the proper foundation for an appeal.' Generally speaking, specific objection should be made to each question propounded, if the answer thereto is claimed to be inadmissible. If counsel makes an objection to a question and that objection be permitted to remain effective throughout the trial to subsequent identical or similar question or questions relating to the same subject matter, without the consent or agreement of the trial court, there would be constant bickering and arguing as to whether subsequent questions were encompassed within the original objection." *Id.* at 94-95.

S & S also sees error because an officer of Fidelity was permitted to explain that the reason the Virginia facility had almost a million pounds less storage in the summer of 1971 than in 1970 was that it was full or its space was committed by a contract with the State Department. An objection was interposed to the original question which was sustained. After an extended discussion between court and counsel the question was again asked and no objection was interposed. A little later, without objection, the same information was elicited. Therefore, if the original question were objectionable and if the point were preserved for appellate review, the error, if there were any, was not prejudicial.

c.

S & S objected to a question to one of the officers of Fidelity:

"Now, as of August the 9th, 1971, when Mr. Schoolfield's letter was received by Fidelity, what effect did that have upon obtaining U. S. Government storage in Sections 9 and 10?"

After discussion between counsel and court, the trial judge

overruled the objection. The witness asked that the question be repeated. It was not read back, but rephrased in a slightly different manner. The reply was:

> "It was limited to 200,000 pounds in each section, 9 and 10, as against the capacity of a million and a half pounds in each section."

The same witness, however, later testified without objection that the original approval as of June 29, 1971, was for 200,000 pounds, that the clearance for the buildings without that limitation came through on October 4, 1971, and that the total capacity of the two warehouses was approximately a million and a half pounds.

Further exception is taken to the fact that an objection to the question to another witness was overruled, a question again directed to the August 9 letter and the effect it had on the operation. The gist of that answer was that they "were limited by the government to 200,000 pounds as an unsprinklered risk," that they "had a 60,000-foot warehouse with nothing in it."

In view of the later testimony without objection as to the original limit and the capacity of the warehouse, the error, if there were error, was not prejudicial.

*Judgment affirmed; appellant to pay the costs.*