877 A.2d 173

**Shin H. KANG**

v.

**STATE of Maryland.**

**No. 1526, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 30, 2005.

Gary E. Bair (Bennett & Bair on the brief), Greenbelt, for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before MEREDITH, CHARLES E. MOYLAN, JR. (Ret., specially assigned), THEODORE G. BLOOM (Ret., specially assigned) JJ.

MEREDITH, J.

Shin H. Kang was convicted of assaulting his wife by hanging her with a rope until she passed out. At the bench trial in the Circuit Court for Montgomery County, there was no dispute that Mrs. Kang had been the object of a hanging. Mr. Kang contended, however, that his wife had attempted to commit suicide because of her great shame about having had

an affair. Mr. Kang testified in his own behalf, and urged the court to find that there was no assault or attempted murder.

The trial judge was not persuaded that Mrs. Kang's hanging was self-inflicted. To the contrary, the trial judge indicated, in the course of delivering his findings, "I believe that [the defendant] did intend to kill Mrs. Kang." Nevertheless, because the trial judge was not convinced beyond a reasonable doubt of Mr. Kang's intent to murder his wife, the court found the defendant not guilty of attempted murder in the first or second degree. Rather, the court found that Mr. Kang was guilty of first degree assault for the hanging incident that occurred on February 8, 2003, and also guilty of a second degree assault for physical contact that occurred on February 19, 2003. Mr. Kang was sentenced to a term of 15 years' incarceration for the first degree assault, and a consecutive five-year term for the second degree assault.

## QUESTIONS PRESENTED

Mr. Kang raises four questions in his appeal to this Court:

I. Whether the trial court failed to insure that the jury waiver was knowing and voluntary.

II. Whether the trial court erred by admitting evidence of prior consistent statements.

III. Whether the trial court violated the dictates of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), in calculating and exceeding the sentencing guidelines applicable to this case.

IV. Whether the trial court erred in denying credit for time served in pretrial home detention.

We shall affirm the judgments of conviction, but with respect to the fourth issue, as to which the State agrees that the defendant should receive credit for his period of home detention, we shall remand the case with instructions that Mr. Kang be given credit for the time served in pretrial home detention.

## BACKGROUND

At the trial, Mrs. Kang told of a long history of physical abuse during her fifteen years of marriage to Mr. Kang. She related that in January of 2003, she traveled to Korea to be with her dying father. After her father's death, Mrs. Kang returned to her home in Montgomery County in early February. Upon her return, Mr. Kang began to accuse her of having an affair.

According to Mrs. Kang, in the early hours of February 8, 2003, after an evening of arguing about the suspected infidelity, Mr. Kang ordered his wife to write out a suicide note as he dictated it. He then escorted her to the basement of their home, where he compelled her to stand on a stool as he tied a nylon rope around her neck. She testified that she was compliant because she thought her husband was trying to humiliate and frighten her, and she knew from experience that resistance could lead to additional physical abuse. She saw her husband kick the stool out from under her feet. As her body dropped and the rope tightened around her neck, she saw her husband walking away before she passed out.

Mrs. Kang testified that when she regained consciousness, she found her husband hovering over her, begging her forgiveness. He carried her upstairs to a bedroom and rubbed Vaseline on her neck. He did not call for medical or other assistance on the morning of the hanging.

Two days later, Mr. Kang took his wife to see Dr. Daniel Kim. Mr. Kang did virtually all of the talking to the doctor. Mrs. Kang wore a scarf around her neck to conceal her wounds that were caused by the rope. The hanging was not mentioned. Instead, Mr. Kang told Dr. Kim that Mrs. Kang had fallen and sustained an injury to her body. Mr. Kang also told Dr. Kim that Mrs. Kang had been depressed over the recent death of her father. Dr. Kim prescribed an analgesic and an anti-depressant, and scheduled a follow-up appointment nine days later.

When the Kangs returned to Dr. Kim on February 19, 2003, they drove in separate cars because Mr. Kang intended to go

straight to work after the visit. Mr. Kang again assumed the role of principal spokesperson. During this second visit, Mr. Kang told Dr. Kim that Mrs. Kang had sustained serious injuries to her neck while she was visiting her family in Korea. Mrs. Kang did not initially contradict her husband's statement to Dr. Kim. After the Kangs departed, however, Mrs. Kang waited until she was certain that Mr. Kang had driven away, and she then returned to Dr. Kim's office. She told Dr. Kim her version of what actually happened to her neck. Dr. Kim advised her to seek outside help.

After she left Dr. Kim's office on February 19, she went to meet with Samuel Lee, a pastor at her church. She showed him her neck, and told him about the incident that caused her injury. Pastor Lee advised her to call the police if she had additional problems with her husband. While Mrs. Kang was meeting with Pastor Lee, her cellular phone rang several times, but she declined to answer the phone because she could see that the calls were from her husband.

Mrs. Kang went home after meeting with her pastor. Mr. Kang arrived soon thereafter. He seemed angry, and he directed her to accompany him to the upstairs bedroom. Before going upstairs, Mrs. Kang whispered to her teenage daughter to call the police if Mrs. Kang screamed.

When the Kangs were alone upstairs, Mr. Kang pushed his wife several times. She screamed. Within minutes, police officers responded to the daughter's telephone call.

The police officers separated the Kangs, and Mrs. Kang told the police officers of the hanging incident. After Mrs. Kang stated that Mr. Kang had threatened to shoot her and the children, the police asked Mr. Kang whether there were any weapons in the house. Mr. Kang acknowledged that he had in fact purchased a 380 automatic handgun on February 10, 2003, and had taken possession of the gun and brought the gun home on February 19, 2003.

Following an investigation, a grand jury indicted Mr. Kang on charges of first degree attempted murder, second degree attempted murder and first degree assault for the hanging

incident of February 8, 2003. He was also charged with second degree assault for the pushing incident that occurred on February 19, 2003.

## I. Waiver of Right to Trial By a Jury

Although Mr. Kang asked to be tried by a judge rather than a jury, he now contends that his waiver of his right to be tried by a jury was defective for two reasons. He argues:

> First, Mr. Kang's lack of understanding of the English language and the court's failure to translate the colloquy into Korean renders the waiver voir dire a nullity. Second, the [S]partan colloquy utterly fails to address the voluntariness of the waiver, and thus is defective for this reason as well.

Neither contention is well-founded.

### *Translation of Rule 4–246(b) Examination*

 The record indicates that, on the morning of Mr. Kang's trial, a court-appointed interpreter was present and sworn before the proceedings in the case began. *See* Md. Code (1957, 2001 Repl.Vol.), Criminal Procedure Art. ("C.P."), § 1–202(a)(2) ("The court shall appoint a qualified interpreter to help a defendant in a criminal proceeding throughout any criminal proceeding when the defendant ... cannot readily understand or communicate the English language and cannot understand a charge made against the defendant or help present the defense."). Mr. Kang's counsel informed the trial court that Mr. Kang intended to waive his right to a jury trial. Pursuant to Maryland Rule 4–246(b), the trial court conducted an examination of Mr. Kang on the record in open court to determine whether the waiver was made knowingly and voluntarily. The transcript reflects the following:

> [DEFENSE COUNSEL]: Your Honor, the only other issue that I had was that I just wanted to put on the record that Mr. Kang had agreed with the waiver of the jury trial. THE COURT: All right. Let me just briefly voir dire Mr. Kang in that regard.... Mr. Kang, you have an absolute right to a trial by jury in this matter. You also have the

right to choose a trial by a judge. In this case, it would be myself.

Do you understand that if you had a trial by a jury, there would be 12 men and women chosen from the community and your attorney would be able to participate in the selection of that jury and that jury would decide your guilt or innocence of the charges?

Do you understand that?

A [The transcript does not specify whether the answers were spoken by Mr. Kang personally or by the interpreter on behalf of Mr. Kang.] Yes.

Q Do you understand that if you had a trial by a jury, before you could be convicted by a jury, all 12 jurors would have to unanimously agree upon your guilt? Just for the record, you do understand that?

A Yes, I understand.

Q And just by way of example, if you had a jury trial and 11 jurors wanted to convict and one juror did not, you would not be convicted. Do you understand that?

A Yes.

Q And is it your decision to waive the jury trial and elect to have a trial before me today in this court?

A Yes.

THE COURT: Very well. I am satisfied that Mr. Kang has knowingly and voluntarily waived his right to a trial by a jury.

Although the record clearly reflects that the Korean translator was present before the above examination took place, the record does not specifically reflect whether there was any translation of the judge's questions. Having reviewed the entire trial transcript, we observe that the transcript rarely specifies whether the court-appointed translator is translating the dialogue simultaneously. There is, however, an indication at the conclusion of the prosecutor's opening statement that followed the jury waiver examination that, at that particular juncture, the translator was not attempting to simultaneously

translate the attorneys' remarks. At the close of her opening statement, the prosecutor commented, "I couldn't help but notice that I haven't heard any translation." The following discussion is recorded:

> [DEFENSE COUNSEL]: I was about to ask the Court's indulgence, Your Honor. The translator was writing everything down while it was going on and we are going to ask that he repeat it.
>
> THE COURT: I guess that is somewhat unusual. I certainly want Mr. Kang to have the benefit of a translation but is there a reason why—
>
> [DEFENSE COUNSEL]: Mr. Kang understand [sic] English fairly well and we just wanted to make sure he was getting all of the pieces while that was going on.
>
> THE INTERPRETER: Your Honor, may I?
>
> THE COURT: Sure.
>
> THE INTERPRETER: Mr. Kang specifically asked me to translate the things that he feel [sic] that he did not understand prior to the opening of the trial. . . .
>
> . . .
>
> THE COURT: So, just so I am clear on it. Are you only translating certain things if Mr. Kang indicates he doesn't understand?
>
> THE INTERPRETER: That is correct, Your Honor.

The interpreter claimed that simultaneous translation would be difficult to perform given the grammatical differences between Korean and English, and the speed of the parties' communications. Nevertheless, the interpreter assured the court that he had interpreted in criminal proceedings "[t]housands of times" over the past 30 years.

The court recessed briefly and confirmed that the interpreter was properly registered with the Maryland court system. When the court reconvened, Mr. Kang's counsel expressed Mr. Kang's satisfaction with the services of the interpreter:

[DEFENSE COUNSEL]: ... While [the court was] recessed, I spoke to [the interpreter] and my client and my client is very satisfied that [this interpreter] can do the job. There apparently had been some problems in the past with other interpreters.

[This interpreter] was not one of them and my client is prepared to be voir dired by Your Honor just to make sure that the State's concerns and my concerns are covered and that he is confident with [the interpreter].

THE COURT: Very well. Mr. Kang, let me ask you. It is critically important that you understand everything that is said at this time and that you be able to fully participate in this trial whether that involves discussing matters with your counsel, understanding the testimony or testifying at this trial if you choose to do that.

What I want to do is I want to be absolutely sure that you are satisfied with the services of [this interpreter] as the interpreter and that you are comfortable with your ability to communicate with him and understand through him what has been said at this trial.

Have you had an opportunity to discuss this matter with [the interpreter] this morning?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with [this interpreter's] services as an interpreter?

THE DEFENDANT: I am satisfied.

THE COURT: Are you satisfied with [this interpreter] serving as the interpreter that you will be able to understand what is being said by others and will be able to communicate fully with your counsel and with the Court?

THE DEFENDANT: Yes.

THE COURT: [Mr. Interpreter], I need to have you then state what it is that Mr. Kang is saying. The problem I am having is I know that Mr. Kang has some English skills and is able to communicate to some extent in English, but just to be consistent, I am going to either need to have you or Mr. Kang answer one or two questions.

THE INTERPRETER: Yes, Your Honor.

THE COURT: When you said, yes, Mr. Kang understands that and is satisfied[,] is that what I understand?

THE DEFENDANT: Yes.

THE COURT: All right. Very well. [Mr. Defense counsel], are you satisfied at this point that we can proceed and have your client be able to fully participate in this trial and understand what is being said?

[DEFENSE COUNSEL]: Yes, I am, Your Honor.

THE COURT: Very well. Now, at this point, the only thing we have done is we have proceeded with an opening statement by the State and at that point I understand that Mr. Kang was having that statement translated for him by [the interpreter].

Has Mr. Kang now had that opening statement translated to his satisfaction so that we can proceed or do you need some time to go over that with him?

THE DEFENDANT: I understood all.

Although the trial court paused to make sure that the State's opening statement was translated for Mr. Kang, the record does not specifically reflect whether the interpreter translated the voir dire regarding Mr. Kang's waiver of his right to a jury trial. Neither the court nor counsel asked the interpreter to revisit the questioning regarding Mr. Kang's waiver of the right to a trial by jury.

Because English is not Mr. Kang's native language, Mr. Kang asserts on appeal that his waiver was not "knowingly" made. Assuming that an issue regarding the interpreter's conduct is preserved for our consideration even though it was not raised by defense counsel at the time of trial, *cf. Valiton v. State*, 119 Md.App. 139, 149–50, 704 A.2d 478, *cert. denied*, 349 Md. 495, 709 A.2d 140 (1998) (failure to object to delay in examination waived issue for appeal), our review of the record satisfies us that Mr. Kang's waiver of a trial by jury was not the product of any language difficulty.

First, there was a very experienced court-appointed Korean translator in the courtroom to assist Mr. Kang during his examination regarding the waiver of jury trial. Mr. Kang had previously had the benefit of an interpreter at other pre-trial hearings in this case, and was aware that he could seek the interpreter's assistance if there was any aspect of the proceeding that he was having difficulty understanding.

It is also clear from the record that this defendant spoke English well enough to know when he needed to confer with the court-appointed interpreter. During the trial, when discussing the issue of simultaneous translation, Mr. Kang's counsel told the court that "Mr. Kang understand[s] English fairly well. . . ." During the examination of the Kangs' teenage daughter on the second day of the trial, the prosecutor pointed out to the court that "the translator is not translating again." The trial judge confirmed that Mr. Kang did not require simultaneous translation by inquiring as follows:

THE COURT: Well, I had understood that, based on our colloquy yesterday, that [the interpreter] and Mr. Kang were both satisfied that there was sufficient translation for him to understand whatever was taking place in the proceeding.

[THE INTERPRETER]: Sure, I did ask him again. He specifically asked me not to. He understood, he understands. That's what he tells me.

THE COURT: All right. That was [the interpreter's] response, just for the record. Mr. Kang, let me just ask you, are you satisfied that you understand what is being said in the proceedings at this time?

MR. KANG: Yes, I am satisfied.

During the cross-examination of the defendant at trial, Mr. Kang stated he had been an employee of the post-office for 17½ years, and that he spoke English "[w]ell[,]" but "not very well." The record further reflects, however, that Mr. Kang answered some of the State's questions using English when he was cross-examined at trial. This prompted the interpreter to ask the court: "Would it be possible that—he seems to be able

to understand and respond, but just in case that he feels that he needs my assistance—."

Although the interpreter was instructed to continue with simultaneous translation during the trial, Mr. Kang's counsel expressly waived simultaneous translation during the hearing on post-trial motions, again confirming Mr. Kang's general familiarity with the English language. At that hearing, the following colloquy is recorded:

THE COURT: Just back up for a second, you know, I didn't notice our interpreter is not interpreting.

\* \* \*

[W]hy don't you have a brief discussion with our interpreter and make sure you all—

\* \* \*

[DEFENSE COUNSEL]: Your Honor, we had a discussion with our client and if there's something he thinks he doesn't understand, [at] some point he's going to ask the interpreter to clarify. . . .

THE COURT: I just want to make sure, [Counsel], you're satisfied—

[DEFENSE COUNSEL]: I am satisfied.

THE COURT:—that your client has the opportunity—

[DEFENSE COUNSEL]: We are.

THE COURT:—to understand or participate—

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT:—to the full extent that he wishes to in this hearing, all right? Go ahead.

Given Mr. Kang's demonstrated ability to converse in English, the availability of the services of a skilled Korean interpreter, and Mr. Kang's affirmative responses to the court's questions on voir dire, we conclude that Mr. Kang knowingly waived his right to a trial by jury. *Cf. Biglari v. State,* 156 Md.App. 657, 668, 847 A.2d 1239 (2004) (court did not err in refusing to appoint an interpreter under C.P. § 1–

202 for defendant whose native language was Persian, because record contained ample evidence that defendant could understand and communicate in English, could understand the charges against him, and was capable of helping to present his defense).

*Substance of the Court's Rule 4–246(b) Examination*

Maryland Rule 4–246 provides in part:

(a) **Generally.** In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule. If the waiver is accepted by the court, the State may not elect a trial by jury.

(b) **Procedure for Acceptance of Waiver.** A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily.

The Court of Appeals has repeatedly stated that whether there has been a knowing and voluntary waiver of the right to a jury trial depends upon the facts and circumstances of each case. *Tibbs v. State*, 323 Md. 28, 31, 590 A.2d 550 (1991); *State v. Hall*, 321 Md. 178, 182, 582 A.2d 507 (1990); *Martinez v. State*, 309 Md. 124, 134, 522 A.2d 950 (1987). In *Martinez*, the Court concluded: "In determining whether the defendant has knowingly and voluntarily waived his right to a jury trial, the questioner need not recite any fixed incantation." 309 Md. at 134, 522 A.2d 950. *See State v. Bell*, 351 Md. 709, 720, 720 A.2d 311 (1998) ("[S]o long as a defendant knows he is giving up his right to be tried by a jury, possesses a general knowledge of the nature of a jury trial and waives that right voluntarily, the dictates of the current rule are met."). Nevertheless, "the trial court must satisfy itself that the waiver is not a product of duress or coercion, and further that the defendant has some knowledge of the jury trial right

**36**

before being allowed to waive it." *Tibbs,* 323 Md. at 31, 590 A.2d 550 (quoting *Hall,* 321 Md. at 182–83, 582 A.2d 507). If the record does not disclose a knowledgeable and voluntary waiver of a jury trial, a new trial is required. *Martinez,* 309 Md. at 136, 522 A.2d 950.

It is also necessary that the defendant be the one who responds to the questioner's inquiry. Quoting *Countess v. State,* 286 Md. 444, 454, 408 A.2d 1302 (1979), the Court in *Martinez* held: "The Rule does not envision that counsel simply repeat to the court that he has inquired of the defendant and given him the information necessary for an effective election." *Martinez,* 309 Md. at 133, 522 A.2d 950.

▮ Nevertheless, we may presume that criminal defendants represented by counsel have been informed of their constitutional rights. *State v. Bell,* 351 Md. at 727, 720 A.2d 311 (1998); *Thanos v. State,* 330 Md. 77, 91, 622 A.2d 727 (1993); *Oken v. State,* 327 Md. 628, 639, 612 A.2d 258 (1992); *Gilliam v. State,* 320 Md. 637, 652, 579 A.2d 744 (1990). Five days prior to his trial, Mr. Kang's attorney filed a formal Motion to Waive Jury Trial. Subsequently, just before the trial began, and prior to the voir dire, Mr. Kang's attorney orally stated in open court on the record that Mr. Kang had agreed to waive his jury trial right. From these actions, we may presume that Mr. Kang's attorney had informed Mr. Kang of his right to a trial by jury, as well as the potential advantages and disadvantages of having the gruesome allegations made by his wife evaluated by a judge rather than a jury.

In addition to claiming that there was no knowing waiver because of the lack of simultaneous translation of the voir dire (if indeed that is what transpired), Mr. Kang also argues that his waiver was not knowingly made because the trial court failed to inform him that a jury would have to find him guilty beyond a reasonable doubt. Given that a trial judge, when sitting as a trier of fact, is also required to find a defendant guilty beyond a reasonable doubt, we see no fatal error in the

court's failure to cover this specific point. The State's burden of proof is the same whether the trial is by a jury or a judge.

Relying upon *Martinez, supra,* 309 Md. 124, 522 A.2d 950, Mr. Kang also contends that the court failed to make any inquiry into whether his waiver was made voluntarily, because there were no questions that specifically addressed whether the waiver was the product of duress or coercion. In *Martinez,* the Court of Appeals held that the transcript of Martinez's waiver hearing did not support the trial judge's conclusion that the defendant, who had some difficulty speaking English, had voluntarily waived his right to a jury trial. *Id.* at 134–35, 522 A.2d 950. The Court found the following colloquy particularly significant:

THE COURT: Has any person, either inside or outside of this courthouse, made you any promise, or has anyone threatened you in any way in order to have you give up your right to a jury trial?

MR. MARTINEZ: Yes.

Following Martinez's affirmative response to the court's question regarding the possibility of coercion, the trial court simply went on to the next question, ignoring Martinez's answer. Although the Court of Appeals reiterated that the trial judge need not follow a specific ritual or fixed litany in determining voluntariness, it could not conclude that Martinez's waiver was voluntary. *Id.* at 136, 522 A.2d 950.

The instant case differs, however, in that Mr. Kang never gave a response to any of the court's questions that would indicate that he was under duress or coerced into waiving his jury trial right. After Mr. Kang's attorney informed the court that Mr. Kang wished to waive his right to a jury trial, the court asked Mr. Kang: "And is it your decision to waive the jury trial and elect to have a trial before me today in this court?" Mr. Kang responded, "Yes." Mr. Kang's affirmative answer and his responses to the rest of the court's questions were sufficient for the trial court to conclude that Mr. Kang voluntarily waived his right to a jury trial.

We note that, in many other cases, trial courts have asked other questions concerning the voluntariness of a waiver, such as whether the defendant was under the influence of drugs or alcohol, or if the defendant was threatened. Although we recognize that "this is the preferable practice," *id.* at 134 n. 11, 522 A.2d 950, we are nevertheless instructed by the Court of Appeals that "[t]he trial judge need not follow a specific ritual or fixed litany in determining the voluntariness of the defendant's election to waive his jury right." *Id.* *See also Dortch v. State,* 290 Md. 229, 235, 428 A.2d 1220 (1981) ("[T]he failure of the trial judge to specifically inquire as to whether the jury trial waivers were induced by promises or by physical or mental coercion did not constitute error.").

Accordingly, we affirm the trial court's conclusion that Mr. Kang's waiver of his right to a trial by a jury was made knowingly and voluntarily.

## II. Prior Consistent Statements

■ Mr. Kang's sole attack upon the substance of the court's finding of guilt is based upon the trial judge's admission of testimony regarding prior consistent statements Mrs. Kang made to her pastor, her doctor, and two police officers. Mr. Kang contends the court's error in admitting evidence that Mrs. Kang had made prior consistent statements accusing Mr. Kang of hanging her requires reversal of his convictions.

The State responds that the defendant's objection to the evidence regarding prior consistent statements was not effectively preserved for appellate review. We agree that the objection was not preserved.

In the defense counsel's opening statement, the defendant conceded: "There is no question here ... that in the early morning hours of February [8,] 2003, a very tragic circumstance took place and either Mrs. Kang committed suicide or Mr. Kang attempted to kill her. That is clear and that is evident." The defendant pointed out that the case turned upon whether the court believed the husband or believed the wife.

Mrs. Kang was called as the State's first witness. Through a Korean interpreter, she testified at length regarding a marriage that involved routine beatings by her husband. She recounted that her husband "would say that he could kill me without anyone knowing, that he could even make a perfect crime, things like that." She described the events that occurred on the evening of February 7 and in the early hours of February 8. She said Mr. Kang dictated a suicide note, which she wrote "because I thought that he would start hitting me with his fists ... if I did not do what he told me to do." The note, which was introduced into evidence, read: "Forgive my affair. I was too shameful[,] ashamed mother for the children and please take care of our children."

Mrs. Kang testified that after she finished writing the note, Mr. Kang grabbed her arm and led her to the basement. He had installed a bright neon-colored plastic rope at the ceiling, above a stool. She noticed that there was a noose on the rope. As ordered by Mr. Kang, she stood on the stool as he placed the rope around her neck. Even at that point, she thought that he was simply threatening her. After asking her if she had anything to say, her husband kicked the stool out from under her, and she was just hanging from the ceiling. She saw her husband walking away as she lost consciousness. The next thing she remembered was regaining consciousness, and hearing her husband crying, saying he was sorry, and saying that he had almost killed her.

Mrs. Kang further testified that she told no one about the incident for several days. She said she was afraid of her husband and afraid of involving her children. She did, however, testify, without objection, that on February 19, 2003, she told Dr. Kim her version of what happened. She further testified, without objection, that, after she left Dr. Kim's office, she went to see Pastor Lee and told him of the incident that she had experienced. She also testified that when the police came to her home on the evening of February 19, she told them what had happened previously.

On cross-examination, defense counsel attempted to poke holes in Mrs. Kang's story about the hanging. As permitted by Maryland Rule 5–616(a)(2), Mrs. Kang's credibility was attacked by "questions that [we]re directed at ... [p]roving that the facts are not as testified to by the witness." The defense asked questions that suggested the hanging was actually a failed suicide attempt, and that Mrs. Kang's motive was her shame about Mr. Kang accusing her of an affair and requesting a divorce. She acknowledged it would be shameful in her culture for a wife to be divorced because of having an affair. She was asked numerous questions about her relationship with the man her husband suspected of being her paramour.

Among the questions defense counsel asked to cast doubt on Mrs. Kang's testimony that her husband had tried to hang her were: "Mrs. Kang, why didn't you call the police when you were in Pastor Lee's office?" "Isn't it true ... that you continued to allow your children to be alone with your husband because you really didn't think he was a dangerous person?" "Isn't it true ... that you really weren't afraid of your husband?" "You set him up, didn't you, Mrs. Kang?" "[D]idn't you intentionally establish the situation where your husband would be angry and you had preplanned yelling and having your daughter call the police?" "You didn't attempt to run away, Mrs. Kang, because what you described never happened, did it?" "[D]id [Mr. Kang's sister] ask you why didn't you call the police right away on the day you were forced to hang yourself?"

Pastor Lee was subsequently called as a witness for the prosecution. He testified that Mrs. Kang had come to his office in February and showed him the scar on her neck. When Pastor Lee was asked what Mrs. Kang had told him about the scar, the defense raised an objection based upon hearsay. The State proffered that the statement of Mrs. Kang should come in as a prior consistent statement, and the court overruled the defendant's hearsay objections.

The direct examination of Pastor Lee included the following exchange:

[PROSECUTOR:] [D]id she tell you how she got the scar?

[PASTOR LEE:] Yes.

[PROSECUTOR:] What did she tell you?

[DEFENSE COUNSEL:] Objection, Your Honor. That is going to call for hearsay.

[PROSECUTOR:] Your Honor, I offer it as a prior consistent statement.

THE COURT: ... I'll overrule and allow him to answer.

[PROSECUTOR:] What did she tell you about how she got the scar?

[PASTOR LEE:] ... She told me that what happened to her of that scar—one day, you know, her husband called her to their bedroom—

[DEFENSE COUNSEL:] Objection, Your Honor. That is clearly hearsay.

\* \* \*

[PROSECUTOR:] Let me try to narrow the question.... What did she tell you about how that injury was inflicted?

\* \* \*

[DEFENSE COUNSEL:] We are going to offer a continuing objection to what she told him and how she got it.... We'll do that for the record.

THE COURT: Pastor, if she told you specifically how the scar on her neck occurred, I will allow you to answer that....

\* \* \*

[PROSECUTOR:] Pastor, can you please tell us what Mrs. Kang told you about how the scar on her neck occurred?

\* \* \*

[PASTOR LEE:] Her husband told her to come downstairs, which she did, and there was a rope hanging from the ceiling. And she was told to climb up to the step, which she did, thinking that it was some sort of play. But, as soon as she went up, he kicked the step.

[PROSECUTOR:] And what happened? Did she tell you what happened to her after he kicked the step away?

[PASTOR LEE:] That she had no recollection because she fainted.

[PROSECUTOR:] Do you recall whether she told you whether there was any kind of note involved in this incident?

[PASTOR LEE:] Yes.

[PROSECUTOR:] What did she tell you about that?

[DEFENSE COUNSEL:] Your Honor, I am going to object to that. We are now moving from the story that he told her [sic] about the rope and now to other aspects of it. So I am going to offer another continuing objection to that.

[PROSECUTOR:] Your Honor, I would argue that this is a prior consistent statement to her testimony in which the defense spent, probably, four hours cross-examining Mrs. Kang, questioning her account of what happened, the logic of it, the credibility of it.

They impeached her, and I am offering this as a prior consistent statement to her testimony. . . .

The prosecutor cited Rules 5–616(c) and 5–801.1(b) in support of her contention that Pastor Lee should be permitted to testify regarding prior statements Mrs. Kang had made that were consistent with her trial testimony. The trial court overruled the objection without further comment.

At the outset, the State contends that the defense waived its objections to testimony about Mrs. Kang's prior consistent statements by failing to assert timely objections when subsequent witnesses were asked similar questions. The State cites *Peisner v. State*, 236 Md. 137, 144, 202 A.2d 585 (1964), *cert.*

*denied,* 379 U.S. 1001, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965), for the proposition that a party cannot claim on appeal that there was prejudicial error in admitting certain testimony as to which an objection was asserted if similar testimony was subsequently admitted through another witness without any objection. *See also S & S Bldg. Corp. v. Fidelity Storage Corp.,* 270 Md. 184, 190, 310 A.2d 778 (1973) ("any objection to its admissibility was waived by its subsequent admission without objection"); *Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 682–83, 298 A.2d 442 (1973) (failure to object to subsequent testimony waived earlier objection to admissibility of evidence).

In Mr. Kang's case, no objection was asserted when Dr. Kim was asked what Mrs. Kang had told him regarding the cause of her neck injuries, and on cross-examination, defense counsel even asked Dr. Kim to repeat what Mrs. Kang had told him about her neck injuries. Nor was there any objection lodged by the defense when one of the police officers who responded to the daughter's call on February 19, 2003, was asked, "Officer Segura, did you ask Mrs. Kang how she got that marking on her neck? . . . And what did she tell you about that?" Officer Segura responded, without objection:

> She told us that in the early morning of February 8th, her husband had asked her to write a suicide note, stating that she was leaving her kids under his care. And then when they were in the basement, he had put a rope around a floor joist and a plastic stool under it. And there was also a loop at the end of the rope. And he demanded her to step onto the plastic stool and put the rope around her neck. He kicked the plastic stool from her feet.

* * *

> She said that her feet were not touching the ground and that she lost consciousness. And when she regained consciousness, she was on the floor, and that Mr. Kang was saying, "Sorry," and that he was crying, and that he had said something to the effect that she had a black color like a dead person.

Mr. Kang contends that his failure to object to the evidence offered through Dr. Kim and Officer Segura did not waive his prior objections to similar testimony because he had "offered" a continuing objection during Pastor Lee's testimony. The record is clear, however, that the trial judge never granted Mr. Kang a continuing objection. Consequently, he failed to preserve this issue for appeal when he failed to object to the evidence of Mrs. Kang's prior consistent statements elicited during the testimony of Dr. Kim and Officer Segura.

Prior to the adoption of Maryland Rule 4–323(b)—and its civil companions, Rules 2–517(b) and 3–517(b)—there was no provision for trial attorneys to make a "continuing objection" to evidence. Numerous cases from the Court of Appeals held that objections to evidence had to be renewed each time an objectionable question was asked, and that the failure to do so waived the point for appeal. As a consequence, trial advocates were oftentimes obligated to lodge repetitive and disruptive objections, over and over again, even though everyone in the courtroom knew that the objections were going to be over-ruled.

The Maryland Rules revisions adopted in 1984 addressed this potential problem by giving the trial judge the power to grant a continuing objection when appropriate. Rule 4–323(b) provides:

> At the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope.

It is clear from the language of the rule that a continuing objection is optional for the trial court, in its discretion, to grant. It is not a privilege that can be claimed of right by the objecting litigant. An attorney's "offer" of a continuing objection is without any effect unless the proposed continuing objection is expressly granted by the trial judge, and even then the objection is effective to preserve an issue for appeal "only as to questions clearly within its scope." *Cf. Hall v.*

*State,* 119 Md.App. 377, 390–91, 705 A.2d 50 (1998) ("[I]f the improper line of questioning is interrupted by other testimony or evidence and is thereafter resumed, counsel must state for the record that he or she renews the continuing objection"); *Beghtol v. Michael,* 80 Md.App. 387, 394, 564 A.2d 82 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990) ("In the absence of a continuing objection, specific objections to each question are necessary to preserve an issue on appeal.").

There is nothing in the record in this case that suggests, much less establishes clearly, that the trial judge granted Mr. Kang a continuing objection to all testimony regarding prior consistent statements made by Mrs. Kang. Consequently, any objection regarding the admissibility of prior consistent statements made by Mrs. Kang was waived when the defendant failed to object to the subsequent admission of similar testimony from Dr. Kim and Officer Segura.

### III. Sentencing Guidelines

■ Although Maryland's sentencing guidelines suggest a term of three to eight years for a first degree assault conviction, Mr. Kang was sentenced to a term of fifteen years' incarceration for that offense. Relying upon *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Mr. Kang initially argued that the trial judge had violated Mr. Kang's Sixth Amendment constitutional rights by considering facts that were neither found by a jury nor admitted by the defendant. Between the time Mr. Kang filed his brief and the time of oral argument, however, the Supreme Court decided *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 750, 160 L.Ed.2d 621 (2005), in which the Court clarified that if the subject sentencing guidelines "could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." Because Maryland's sentencing guidelines are purely advisory, Mr. Kang's counsel indicated at oral argument that

he no longer contends that *Blakely* compels a different result. *See* C.P. § 6–211(b) ("Regulations adopted [by the State Commission on Criminal Sentencing Policy] are voluntary sentencing guidelines that a court need not follow."). *See also Teasley v. State,* 298 Md. 364, 367, 470 A.2d 337 (1984).

In Maryland, a sentencing judge is "vested with virtually boundless discretion." *State v. Dopkowski,* 325 Md. 671, 679, 602 A.2d 1185 (1992). "The only restrictions placed on the judge at sentencing are that the sentence not constitute cruel and unusual punishment or violate constitutional requirements; the judge not be motivated by ill-will, prejudice or other impermissible considerations; and that sentence be within the statutory limitation." *Reid v. State,* 302 Md. 811, 820, 490 A.2d 1289 (1985).

The statutory maximum sentence for first degree assault is twenty-five years. Md.Code (1957, 2002 Repl.Vol.), Criminal Law Art., § 3–202(b). In the instant case, the sentencing judge did not exceed this maximum when he sentenced Mr. Kang to a term of fifteen years' incarceration. We will not disturb the length of the sentence.

### IV. Credit for Time Served in Home Detention

Mr. Kang's final argument addresses the trial court's failure to give Mr. Kang credit for time he served on home detention while he was awaiting his trial. Mr. Kang was arrested on February 19, 2003, and was released on bond on March 7, 2003, subject to the condition that he wear a monitoring device—*i.e.,* an ankle bracelet—and that he reside at his home under a "24/7 curfew except for work, court and meet[ing with his] attorney." Mr. Kang's bond was revoked on November 20, 2003, when he was found guilty.

At the sentencing hearing, Mr. Kang asked the court for credit for the time he served on home detention from March 7, 2003 until November 20, 2003. The court refused.

Citing *Spriggs v. State,* 152 Md.App. 62, 69, 831 A.2d 72 (2003), Mr. Kang contends the court erred by refusing to give him credit for the time he was placed on home detention. The

State concedes on this point, also citing *Spriggs*. Accordingly, we shall remand the case to the circuit court for issuance of an order directing that Mr. Kang be given credit for time served while on home detention from March 7, 2003 until November 20, 2003. In all other respects, the judgments are affirmed.

JUDGMENTS AFFIRMED.

CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR ISSUANCE OF AN ORDER DIRECTING THE DIVISION OF CORRECTION TO GIVE APPELLANT CREDIT FOR TIME SERVED ON HOME DETENTION FROM MARCH 7, 2003 UNTIL NOVEMBER 20, 2003.

COSTS TO BE PAID 75% BY APPELLANT, AND 25% BY MONTGOMERY COUNTY.