899 A.2d 843

**Shin H. KANG**

v.

**STATE of Maryland.**

**No. 59, Sept. Term, 2005.**

Court of Appeals of Maryland.

June 2, 2006.

Gary E. Bair (Bennett & Bair, LLP, Greenbelt, on brief), for petitioner/cross-respondent.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

We consider here whether it is fatal to a defendant knowingly and voluntarily waiving his right to a jury trial in a criminal proceeding, in the context of this record, for the trial judge not to include questions in the colloquy addressed specifically to the voluntariness of the defendant's waiver. Also, we ponder whether the waiver was valid where there was no special, heightened inquiry on the record regarding the defendant's understanding of the purported waiver where he used the services of a language interpreter. We consider also whether the defendant's objection to the admissibility of testimonial evidence of prior consistent statements effectively was preserved for appellate review where the trial judge never granted explicitly the defendant's "offer" of a continuing objection interposed only as to the initial of three witnesses.

I.

In a bench trial in the Circuit Court for Montgomery County, at which he was represented by counsel, Shin H.

Kang was convicted of assaulting his wife by hanging her by the neck with a rope until she passed out. During trial, neither party disputed the occurrence of the hanging incident; however, Kang asserted that his wife had attempted to commit suicide out of shame for allegedly being involved in an extra-marital affair, as Kang accused her of. The trial judge found Kang not guilty of attempted murder in the first or second degree, but convicted him of first-degree assault for the hanging of his wife and second-degree assault for physical contact that occurred a number of days after the hanging incident. Kang was sentenced by the court to fifteen years of incarceration for the first-degree assault conviction and five years of incarceration, to be served consecutively, for the second-degree assault conviction.

The Court of Special Appeals, in a reported opinion, *Kang v. State*, 163 Md.App. 22, 877 A.2d 173 (2005), affirmed the judgments of conviction. In that appeal, Kang argued that his jury trial waiver in the Circuit Court was defective for two reasons. First, Kang lacked an understanding of the English language and therefore the trial court's failure to translate the waiver colloquy into Korean caused the resultant waiver to be invalid. Second, the trial judge's colloquy failed to inquire specifically into the voluntariness of the defendant's waiver. Kang argued also that testimony regarding prior consistent statements Mrs. Kang made to her pastor, her doctor, and two police officers were improperly admitted into evidence.[1]

As to the jury waiver, the Court of Special Appeals concluded that it was satisfied that "Mr. Kang's waiver of a trial by jury was not the product of any language difficulty." *Kang*, 163 Md.App. at 32, 877 A.2d at 179. Moreover, "Mr. Kang

---

1. The Court of Special Appeals considered also whether the Circuit Court violated the dictates of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), in calculating and exceeding the sentencing guidelines applicable to the case, and whether the trial court erred in denying credit for time served in pretrial home detention. The intermediate appellate court ruled against Kang on the first question, but remanded the case to the trial court with instructions that Kang be given credit for the time served in pre-trial home detention. Neither issue was included in a petition for certiorari filed in this Court.

never gave a response to any of the court's questions that would indicate that he was under duress or coerced into waiving his jury trial right," and therefore an explicit inquiry specifically into voluntariness of the waiver was not required. *Kang,* 163 Md.App. at 37, 877 A.2d at 182. Consequently, the Court of Special Appeals affirmed the trial court's conclusion that Kang knowingly and voluntarily waived his right to a trial by a jury. *Kang,* 163 Md.App. at 38, 877 A.2d at 182. With regard to the admission of the prior consistent statements, the intermediate appellate court, agreeing with the State, concluded that the issue was not preserved effectively for appellate review because the trial judge never granted Kang a continuing objection and the witnesses later testified to the relevant facts without contemporaneous objection. *Kang,* 163 Md.App. at 38, 45, 877 A.2d at 182, 186.

Kang filed a Petition for Writ of Certiorari. In addition to answering Kang's petition, the State filed a Conditional Cross–Petition. We granted both petitions to determine whether the Court of Special Appeals correctly concluded that: (1) the defendant "knowingly and voluntarily" waived his right to a jury trial as required under Maryland Rule 4–246(b) and (2) the defendant's objection to the admissibility of testimonial evidence of prior consistent statements was not preserved effectively for appellate review. *Kang v. State,* 388 Md. 673, 882 A.2d 286 (2005).[2]

---

2. In his brief, Kang outlined the following questions for our review:
(1) Did the Court of Special Appeals err in ruling that the jury trial waiver was "knowing and voluntary" under Maryland Rule 4–246(b), where the record showed that: the waiver inquiry was not translated from English to Mr. Kang's native language of Korean; and the waiver colloquy contained absolutely no inquiry as to voluntariness?
(2) Did the Court of Special Appeals err in ruling that a continuing objection made twice by counsel did not preserve an issue for appeal because the trial judge did not expressly "grant" the continuing objection?
(3) Must a defendant object to the propriety of a jury trial waiver at trial in order to preserve the issue for appellate review?
Kang raised the first two questions in his Petition for Writ of Certiorari, while the third question was raised in the State's Conditional Cross–Petition. We shall answer the first and second questions in

## II.

The Court of Special Appeals detailed the events underlying the present case:

At the trial, Mrs. Kang told of a long history of physical abuse during her fifteen years of marriage to Mr. Kang. She related that in January of 2003, she traveled to Korea to be with her dying father. After her father's death, Mrs. Kang returned to her home in Montgomery County in early February. Upon her return, Mr. Kang began to accuse her of having an affair.

According to Mrs. Kang, in the early hours of February 8, 2003, after an evening of arguing about the suspected infidelity, Mr. Kang ordered his wife to write out a suicide note as he dictated it. He then escorted her to the basement of their home, where he compelled her to stand on a stool as he tied a nylon rope around her neck. She testified that she was compliant because she thought her husband was trying to humiliate and frighten her, and she knew from experience that resistance could lead to additional physical abuse. She saw her husband kick the stool out from under her feet. As her body dropped and the rope tightened around her neck, she saw her husband walking away before she passed out.

Mrs. Kang testified that when she regained consciousness, she found her husband hovering over her, begging her forgiveness. He carried her upstairs to a bedroom and rubbed Vaseline on her neck. He did not call for medical or other assistance on the morning of the hanging.

Two days later, Mr. Kang took his wife to see Dr. Daniel Kim. Mr. Kang did virtually all of the talking to the doctor. Mrs. Kang wore a scarf around her neck to conceal her wounds that were caused by the rope. The hanging was not mentioned. Instead, Mr. Kang told Dr. Kim that Mrs. Kang had fallen and sustained an injury to her body. Mr.

the affirmative and, because of those answers, need not address the third question.

Kang also told Dr. Kim that Mrs. Kang had been depressed over the recent death of her father. Dr. Kim prescribed an analgesic and an anti-depressant, and scheduled a follow-up appointment nine days later.

When the Kangs returned to Dr. Kim on February 19, 2003, they drove in separate cars because Mr. Kang intended to go straight to work after the visit. Mr. Kang again assumed the role of principal spokesperson. During this second visit, Mr. Kang told Dr. Kim that Mrs. Kang had sustained serious injuries to her neck while she was visiting her family in Korea. Mrs. Kang did not initially contradict her husband's statement to Dr. Kim. After the Kangs departed, however, Mrs. Kang waited until she was certain that Mr. Kang had driven away, and she then returned to Dr. Kim's office. She told Dr. Kim her version of what actually happened to her neck. Dr. Kim advised her to seek outside help.

After she left Dr. Kim's office on February 19, she went to meet with Samuel Lee, a pastor at her church. She showed him her neck, and told him about the incident that caused her injury. Pastor Lee advised her to call the police if she had additional problems with her husband. While Mrs. Kang was meeting with Pastor Lee, her cellular phone rang several times, but she declined to answer the phone because she could see that the calls were from her husband.

Mrs. Kang went home after meeting with her pastor. Mr. Kang arrived soon thereafter. He seemed angry, and he directed her to accompany him to the upstairs bedroom. Before going upstairs, Mrs. Kang whispered to her teenage daughter to call the police if Mrs. Kang screamed.

When the Kangs were alone upstairs, Mr. Kang pushed his wife several times. She screamed. Within minutes, police officers responded to the daughter's telephone call.

The police officers separated the Kangs, and Mrs. Kang told the police officers of the hanging incident. After Mrs. Kang stated that Mr. Kang had threatened to shoot her and the children, the police asked Mr. Kang whether there were any weapons in the house. Mr. Kang acknowledged that he

had in fact purchased a[.]380 automatic handgun on February 10, 2003, and had taken possession of the gun and brought the gun home on February 19, 2003.

Following an investigation, a grand jury indicted Mr. Kang on charges of first degree attempted murder, second degree attempted murder and first degree assault for the hanging incident of February 8, 2003. He was also charged with second degree assault for the pushing incident that occurred on February 19, 2003.

*Kang,* 163 Md.App. at 26–28, 877 A.2d at 175–76.

### III.

A defendant's right to a jury trial is protected by both the U.S. and Maryland Constitutions. *See* U.S. Const. amend. VI (applying to the states under the Fourteenth Amendment); Md. Const. Declaration of Rights articles 5, 21, and 24. A defendant, however, may choose to waive the right to a jury trial and instead be tried by the court. *See* Md. Rule 4–246(a) ("In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule."). Maryland Rule 4–246(b) sets forth the procedure for waiving a jury trial in a criminal proceeding:

> A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily.

As we have continued to recognize, ultimately, to waive properly this constitutionally protected right the "trial judge must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege." *Smith v. State,* 375 Md. 365, 379, 825 A.2d 1055, 1064 (2003) (Citations omitted). The waiver examination depends upon the facts and circumstances of each case. *State v. Hall,* 321

Md. 178, 182, 582 A.2d 507, 509 (1990) (Citations omitted). "[T]he questioner need not recite any fixed incantation" when evaluating whether the defendant knowingly and voluntarily waived his or her right to a jury trial. *Martinez v. State*, 309 Md. 124, 134, 522 A.2d 950, 955 (1987). "The court must, however, satisfy itself that the waiver is not a product of duress or coercion and further that the defendant has some knowledge of the jury trial right before being allowed to waive it." *Hall*, 321 Md. at 182, 582 A.2d at 509 (citing *Martinez*, 309 Md. at 134, 522 A.2d at 955).

### A.

█ Kang argues that his jury trial waiver was not valid as it was not knowing or voluntary. Initially, Kang iterates that his waiver was not voluntary because the trial court made no specific inquiry to establish the voluntariness of the jury trial waiver. This claim is unavailing.

In *Dortch v. State*, 290 Md. 229, 235, 428 A.2d 1220, 1224 (1981), we determined that the trial judge was not required to inquire specifically as to whether the jury trial waivers of two defendants were induced by promises or by physical or mental coercion. While examining what constituted a "voluntary" waiver under Maryland Rule 735, the predecessor to Rule 4–246(b), which required an election between a jury or court trial rather than the presumption of a jury trial as called for in the current Rule, we noted that nothing in the language of the rule "requires the trial court to inquire of an accused who elects a court rather than a jury trial whether his decision was induced by promises or by physical or mental coercion." *Dortch*, 290 Md. at 235, 428 A.2d at 1223. We stated additionally that "no specific ritual or fixed litany need be followed by the trial judge in determining the voluntariness of the accused's election to waive his right to a jury trial." *Dortch*, 290 Md. at 235, 428 A.2d at 1223–24. Nonetheless, while not required, "many trial judges do direct such an inquiry to defendants who waive jury trials under Rule 735 d and we think this is the preferable practice." *Dortch*, 290 Md. at 236, 428 A.2d at 1224.

In *Martinez v. State, supra,* 309 Md. at 134–35, 522 A.2d at 955, our first contextual encounter with Maryland Rule 4–246 after its adoption, we concluded that the "transcript of the waiver hearing simply d[id] not support the trial court's conclusion that the appellant voluntarily waived his right to a jury trial." The waiver hearing inquiry exposed that, while the defendant felt he was not presently suffering from any physical illness, he currently was taking medication to treat schizophrenia, paranoia, and possibly other psychiatric and psychological conditions. *Martinez,* 309 Md. at 127–28, 522 A.2d at 952. While neither party disputed that the defendant's waiver was knowledgeable, this Court emphasized the following portion of the waiver hearing dialogue with regard to the voluntariness of the waiver:

THE COURT: Are you voluntarily waiving that right?

[DEFENDANT]: I am a little bit nervous.

\* \* \*

THE COURT: Has any person, either inside or outside of this courthouse, made you any promise, or has anyone threatened you in any way in order to have you give up your right to a jury trial?

[DEFENDANT]: Yes.

THE COURT: You stated that you wished to waive your right to a jury trial. Are you certain and are you stating on the record of this Court that you have made that decision freely and voluntarily?

[DEFENDANT]: Just the Judge.

(Emphasis omitted).

*Martinez,* 309 Md. at 128–29, 522 A.2d at 952. Noting as "particularly relevant" the defendant's affirmative response to the question as to whether the waiver decision was induced or coerced, we determined that the trial judge could not ignore the response and the record did not support the notion that the defendant, under those circumstances, voluntarily waived his right to a jury trial. *Martinez,* 309 Md. at 135, 522 A.2d at 955.

In *State v. Hall, supra,* 321 Md. at 183, 582 A.2d at 510, we determined that, based on the record before the trial court, the judge could be satisfied fairly that the defendant knowingly and voluntarily waived his right to a jury trial, as required under Maryland Rule 4–246. We highlighted the fact that the trial court did not ask explicitly the defendant whether he understood what he had been told or whether his election was the result of any physical or mental duress or coercion. *Id.* This Court, nonetheless, concluded that the waiver was knowing and voluntary. In doing so, we emphasized that, in addition to waiving his right in open court following an exchange with the court, the defendant "on two prior occasions, the first in writing, and the second during in-court plea negotiations, [ ] also waived his right to a jury trial; on each occasion, he was also represented by counsel." *Id.* We noted additionally that

> [w]e are, of course, mindful that the cold record before us does not reflect a defendant's demeanor, tone, facial expressions, gestures, or other indicia which, to a trial judge, may be indicative of a knowing and voluntary waiver of the jury trial right. For that reason, we have urged trial judges, as we do again, to be as thorough and detailed in conducting the waiver examination on the record "as time, resources and circumstances permit so as to insulate jury trial waivers from successful direct or collateral attack." *Dortch v. State, supra,* 290 Md. at 235, 428 A.2d 1220.

*Hall,* 321 Md. at 183–84, 582 A.2d at 510. Based on the "totality of the circumstances," we determined that the defendant's waiver was knowing and voluntary. *Hall,* 321 Md. at 183, 582 A.2d at 509.

Most recently, in *Abeokuto v. State,* 391 Md. 289, 324, 893 A.2d 1018, 1038 (2006), a majority of the Court held that the defendant knowingly and voluntarily waived his right to trial by jury for the guilt/innocence phase of a capital proceeding. We emphasized again that the "trial court is not required to engage in a fixed litany or boilerplate colloquy with a defendant." *Abeokuto,* 391 Md. at 320, 893 A.2d at 1036. We noted also that "[n]o facts from the record demonstrate[d] that the

court had reason to ask [the defendant] whether he had been coerced or threatened to waive his right to a jury trial or whether anyone, including defense counsel or the prosecutor, promised [the defendant] anything in exchange for his waiver." *Abeokuto,* 391 Md. at 320–21, 893 A.2d at 1036. While we noted that the record might raise the need for specific consideration of voluntariness because the defendant's mental health was an issue before trial (ultimately resolved in favor of competency) and that the defendant may have been taking a prescription medication prescribed while incarcerated pretrial, the trial judge, immediately before conducting the jury waiver inquiry, heard testimony on the defendant's mental and medication states. *Abeokuto,* 391 Md. at 321, 893 A.2d at 1036. Therefore, we concluded that because those matters had been inquired into immediately prior to the waiver inquiry, "questions directed to those areas were not required in this case" during the waiver colloquy, there having been both an adequate and contemporary consideration of that information. *Id.*

In the present case, the trial judge engaged Kang in the following dialogue regarding his waiver of a jury trial: [3]

[DEFENSE COUNSEL]: Your Honor, the only other issue that I had was that I just wanted to put on the record that Mr. Kang had agreed with the waiver of the jury trial.

THE COURT: All right. Let me just briefly voir dire Mr. Kang in that regard.

THE COURT: Mr. Kang, you have an absolute right to a trial by jury in this matter. You also have the right to choose a trial by a judge. In this case, it would be myself.

Do you understand that if you had a trial by a jury, there would be 12 men and women chosen from the community and your attorney would be able to participate in the selection of that jury and that jury would decide your guilt or innocence of the charges?

---

**3.** The transcript does not specify whether the answers were spoken by Kang personally or by the interpreter on behalf of Kang.

Do you understand that?

A: Yes.

THE COURT: Do you understand that if you had a trial by a jury, before you could be convicted by a jury, all 12 jurors would have to unanimously agree upon your guilt? Just for the record, you do understand that?

A: Yes, I understand.

THE COURT: And just by way of example, if you had a jury trial and 11 jurors wanted to convict and one juror did not, you would not be convicted. Do you understand that?

A: Yes.

THE COURT: And is it your decision to waive the jury trial and elect to have a trial before me today in this court?

A: Yes.

THE COURT: Very well. I am satisfied that Mr. Kang has knowingly and voluntarily waived his right to a trial by a jury.

As the cases, *supra*, recognize, there is no specific ritual or fixed litany required of trial judges in assessing the voluntariness of defendants' jury trial waiver. We therefore begin our analysis with the premise that there is no uniform requirement explicitly to ask a defendant whether his or her waiver decision was induced or coerced, unless there appears some factual trigger on the record, which brings into legitimate question voluntariness. In contrast to the circumstances in *Martinez*, Kang's colloquy responses did not trigger a requirement that the trial judge inquire further as to voluntariness.

## B.

Kang argues additionally that his jury trial waiver was not knowing because the trial judge (1) did not "make any efforts to ascertain whether Kang understood the nature of the rights he was waiving" and (2) the trial judge "did not make sure that the proceedings were translated from English

to Korean." Kang's arguments on this ground shall fail as well.

i.

In contrast to the requirement under former Rule 735 where the record had to show that the defendant was made aware of all aspects of the right to a jury trial when waiving the right, Rule 4–246(b) provides that the trial judge must be satisfied only that the defendant possesses knowledge to fulfill the "more flexible 'knowingly' " requirement. *State v. Bell,* 351 Md. 709, 720, 720 A.2d 311, 316–17 (1998). As we stated, *supra,* as to voluntariness, the questioner is not required to engage in a fixed litany to assess whether a defendant's jury trial waiver is knowing. The contours of the required examination depend upon the facts and circumstances of each case.

In *Tibbs v. State,* 323 Md. 28, 31, 590 A.2d 550, 551 (1991), we held that the "record [wa]s woefully deficient to establish that [the defendant] knowingly and voluntarily relinquished his right to a jury trial." The record there failed to demonstrate that the defendant "received any information at all concerning the nature of the jury trial." *Id.* The Court stated that "[i]t is not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows 'what a jury trial is,' and waives that right 'freely and voluntarily.' " *Tibbs,* 323 Md. at 32, 590 A.2d at 551. Therefore, we determined that, based on the record, the trial judge could not have been satisfied fairly that the defendant knowingly and voluntarily waived his right to a jury trial. *Id.*

While the inquiry in the present case is not clothed in the finest cashmere, the colloquy conducted by the trial judge is certainly not a "naked" inquiry as in *Tibbs.* It more than adequately demonstrates that Kang possessed "some knowledge" of his right to a jury trial. *See Bell,* 351 Md. at 727, 720 A.2d at 320 (Citations omitted). The "byte-sized" questions asked by the trial judge in the present case included a colloquy as to the fundamentals of a jury trial, including that

the defendant possessed the right to a trial by a judge or jury; a jury consists of 12 individuals who are chosen from the defendant's peers; and a jury's decision must be unanimous and, thus, all 12 must be in agreement (the trial judge described an example of unanimity). *See Abeokuto*, 391 Md. at 350 n. 23, 893 A.2d at 1054 n. 23 (noting the preference during the waiver colloquy of jury sentencing rights to present the defendant with information in small, intellectual "bytes" and then inquire discretely after each "byte" whether he or she understands). Kang responded that he understood each of these questions.[4] Thus, we conclude the substance of the colloquy conducted by the trial judge was adequate in informing Kang and ascertaining his awareness of his fundamental jury rights.

ii.

Next, Kang argues that the trial judge should have ensured functionally and on the record that the waiver proceedings were translated for him from English to Korean. Prior to the preliminary hearings, Kang filed a request with the court to appoint a Korean–English languages interpreter. Subsequently, at the start of the first day of the trial proceedings, a Korean–English interpreter was present and duly sworn. Moments later, the trial judge voir dired Kang in English regarding his jury trial waiver. Following that, after a brief statement from by court, the State gave its opening statement.

---

4. In addition, five days prior to trial, Kang, through his attorney, filed a Motion to Waive Jury Trial. Then, immediately before the commencement of trial, defense counsel, in open court before the trial judge, indicated that Kang agreed to waive his right to a jury trial. As the Court of Special Appeals noted in its opinion, *Kang*, 163 Md.App. at 36, 877 A.2d at 181, this Court has recognized the presumption that criminal defendants who are represented by counsel have been informed of their constitutional rights. *See, e.g., Bell*, 351 Md. at 727, 720 A.2d at 320 (Citations omitted); *Thanos v. State*, 330 Md. 77, 91, 622 A.2d 727, 733 (1993) (Citations omitted); *Gilliam v. State*, 320 Md. 637, 652, 579 A.2d 744, 751 (1990) (Citation omitted). *But see Abeokuto v. State*, 391 Md. 289, 348 n. 21, 893 A.2d 1018, 1052 n. 21 (2006) (noting that the presence of an attorney will not mitigate an inaccurate or incomplete court advisement of a jury sentencing right).

The following exchange occurred upon the conclusion of the State's opening argument:

[PROSECUTOR]: Your Honor, can I just—I note for the record that I couldn't help but notice that I haven't heard any translation.

[DEFENSE COUNSEL]: I was about to ask the Court's indulgence, Your Honor. The translator was writing everything down while it was going on and we are going to ask that he repeat it.

THE COURT: I guess that is somewhat unusual. I certainly want Mr. Kang to have the benefit of a translation but is there a reason why—

[DEFENSE COUNSEL]: Mr. Kang understand[s] English fairly well and we just wanted to make sure he was getting all of the pieces while that was going on.

THE INTERPRETER: Your Honor, may I?

THE COURT: Sure.

THE INTERPRETER: Mr. Kang specifically asked me to translate the things that he feel[s] that he did not understand prior to the opening of the trial.

\* \* \*

THE COURT: So, just so I am clear on it. Are you only translating certain things if Mr. Kang indicates he doesn't understand?

THE INTERPRETER: That is correct, Your Honor.

■ This Court recognizes the presumption that the actions of a trial court ordinarily are correct and the party claiming error bears the burden of rebutting that presumption. *State v. Chaney,* 375 Md. 168, 183–84, 825 A.2d 452, 461 (2003) (quoting from *Fisher v. State,* 128 Md.App. 79, 104–05, 736 A.2d 1125, 1138–39 (1999)). This rule is derived from a general presumption of regularity in the prior proceedings. *Id.* (quoting from *Bradley v. Hazard Technology Co.,* 340 Md. 202, 206, 665 A.2d 1050, 1052 (1995), which cited *Hagerstown Trust Co., Ex. of Mealy,* 119 Md. 224, 230, 86 A. 982, 984 (1913)). Consequently, we presume that the Korean–English

interpreter "interpret[ed] accurately, completely, and impartially" as required in the oath taken by interpreters, which is set forth in Maryland Rule 16–819(d)(3).[5] *See also* Maryland Rules, Appendix: Maryland Code of Conduct for Court Interpreters, Canon 1 ("Interpreters shall render a complete and accurate interpretation of sight translation, without altering, omitting, or adding anything to what is stated or written and without explanation.").

Kang contends that the prosecutor's statement ("Your Honor, can I just—I note for the record that I couldn't help but notice that I haven't heard any translation.") indicates that the jury waiver colloquy was not translated for him into Korean, and because the record does not conclusively show that the voir dire was translated, Kang did not understand the rights he was waiving. As the Court of Special Appeals also noted, *Kang*, 163 Md.App. at 29, 877 A.2d at 177, trial transcripts rarely indicate whether dialogue is being translated simultaneously. As a result of the prosecutor's statement following the State's opening argument, however, the trial judge engaged in the following exchange with Kang to ensure his satisfaction with the translation services of the interpreter:

[PROSECUTOR]: ... [Defense Counsel] had indicated that his client is satisfied.

[DEFENSE COUNSEL]: Yes, Your Honor. While [the court was] recessed, I spoke to [the interpreter] and my client and my client is very satisfied that [this interpreter] can do the job. There apparently had been some problems in the past with other interpreters.

[This interpreter] was not one of them and my client is prepared to be voir dired by Your Honor just to make sure

---

5. Maryland Rule 16–819(d)(3) states:

Oath. Upon appointment by the court and before acting as an interpreter in the proceeding, the interpreter shall solemnly swear or affirm under the penalties of perjury to interpret accurately, completely, and impartially and to refrain from knowingly disclosing confidential or privileged information obtained while serving in the proceeding.

that the State's concerns and my concerns are covered and that he is confident with [the interpreter].

THE COURT: Very well. Mr. Kang, let me ask you. It is critically important that you understand everything that is said at this time and that you be able to fully participate in this trial whether that involves discussing matters with your counsel, understanding the testimony or testifying at this trial if you choose to do that.

What I want to do is I want to be absolutely sure that you are satisfied with the services of [this interpreter] as the interpreter and that you are comfortable with your ability to communicate with him and understand through him what has been said at this trial.

Have you had an opportunity to discuss this matter with [the interpreter] this morning?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with [this interpreter's] services as an interpreter?

THE DEFENDANT: I am satisfied.

THE COURT: Are you satisfied with [this interpreter] serving as the interpreter that you will be able to understand what is being said by others and will be able to communicate fully with your counsel and with the Court?

THE DEFENDANT: Yes.

THE COURT: [Interpreter], I need to have you then state what it is that Mr. Kang is saying. The problem I am having is I know that Mr. Kang has some English skills and is able to communicate to some extent in English, but just to be consistent, I am going to either need to have you or Mr. Kang answer one or two questions.

THE INTERPRETER: Yes, Your Honor.

THE COURT: When you said, yes, Mr. Kang understands that and is satisfied[,] is that what I understand?

THE DEFENDANT: Yes.

THE COURT: All right. Very well. [Defense counsel], are you satisfied at this point that we can proceed and have

your client be able to fully participate in this trial and understand what is being said?

[DEFENSE COUNSEL]: Yes, I am, Your Honor.

THE COURT: Very well. Now, at this point, the only thing we have done is we have proceeded with an opening statement by the State and at that point I understand that Mr. Kang was having that statement translated for him by [the interpreter].

Has Mr. Kang now had that opening statement translated to his satisfaction so that we can proceed or do you need some time to go over that with him?

THE DEFENDANT: I understood all.

Kang continued to indicate his satisfaction with the quality and quantity of translation throughout the trial. The following exchange occurred immediately after the last question during the defense's cross-examination of Caroline Kang, the defendant's daughter, on the second day of trial:

[PROSECUTOR]: Your Honor, I actually didn't notice, but [my co-counsel] did—I have a situation where the translator is not translating again.

THE COURT: Well, I had understood that, based on our colloquy yesterday, that [the interpreter] and Mr. Kang were both satisfied that there was sufficient translation for him to understand whatever was taking place in the proceeding.

[THE INTERPRETER]: Sure, I did ask him again. He specifically asked me not to. He understood, he understands. That's what he tells me.

THE COURT: All right. That was [the interpreter's] response, just for the record. Mr. Kang, let me just ask you, are you satisfied that you understand what is being said in the proceedings at this time?

MR. KANG: Yes, I am satisfied.

THE COURT: All right, very well.

In fact, as the Court of Special Appeals also noted, *Kang*, 163 Md.App. at 34, 877 A.2d at 179–80, during the hearing on

post-trial motions, Kang's attorney expressly waived simultaneous translation:

THE COURT: Just back up for a second, you know, I[ ] notice[d] our interpreter is not interpreting.

\* \* \*

THE COURT: Well, [Defense Counsel], why don't you have a brief discussion with our interpreter and make sure you all—

[DEFENSE COUNSEL]: I think this [issue] came up at trial too. Could we have a husher [6] for a few minutes?

THE COURT: Sure.

\* \* \*

[DEFENSE COUNSEL]: Your Honor, we had a discussion with our client and if there's something he thinks he doesn't understand, [at] some point he's going to ask the interpreter to clarify. . . .

THE COURT: I just want to make sure, [Defense Counsel], you're satisfied—

[DEFENSE COUNSEL]: I am satisfied.

THE COURT:—that your client has the opportunity—

[DEFENSE COUNSEL]: We are.

THE COURT:—to understand or participate—

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT:—to the full extent that he wishes to in this hearing, all right? Go ahead.

The record also shows that Kang demonstrated his ability to converse in English. As the Court of Special Appeals noted, *Kang,* 163 Md.App. at 33, 877 A.2d at 179, Kang had been an employee of the U.S. Postal Service for 17 and ½ years; Kang proclaimed that he spoke English "[w]ell[,]" but "not very well;" Kang's attorney described to the court that "Mr. Kang understand[s] English fairly well. . . .;" and, in fact, during

---

**6.** A "husher" is a mechanical device used to foster confidential conversations in the courtroom, that is, to inhibit a jury from overhearing what counsel and/or clients may say.

trial, Kang answered some of the State's questions during cross-examination using English. Even when Kang apparently encountered language difficulties, the record demonstrates that Kang continued to be satisfied with the translation from his interpreter. Thus, the record is persuasive that the jury trial waiver was likely not the result of language deficiency; we conclude Kang's waiver was knowing.

We find no requirement of simultaneous, word-for-word translation, whether on or off the record. *See, e.g.,* Maryland Rules, Appendix: Maryland Code of Conduct for Court Interpreters, Canon 1 Commentary ("[I]nterpreters are obligated to apply their best skills and judgment to preserve faithfully the meaning of what is said in court, including the style or register of speech. Verbatim, 'word for word,' or literal oral interpretations are not appropriate if they distort the meaning of the source language, but every spoken statement, even if it appears non-responsive, obscene, rambling, or incoherent, should be interpreted. This includes apparent misstatements."). Thus, given the varying comprehension levels of defendants for whom English may be a second language and the intricacies of interpreting different languages, at this juncture, we shall not proclaim a single bright-line rule requiring simultaneous, word-for-word translation in all cases in which an interpreter is appointed. In the present case, we are satisfied that Kang had an opportunity to understand and participate in his criminal proceedings. Moreover, every indication is that Kang did just that. Accordingly, we conclude that the trial judge, based on this record, reasonably could be satisfied that Kang knowingly and voluntarily waived his right to a jury trial.

## IV.

Kang argues also that the trial judge improperly admitted evidence of Mrs. Kang's prior consistent statements regarding the hanging incident on 8 February 2003 through testimony by a pastor, doctor, and police officer. Because he offered a continuing objection during Pastor Lee's direct

examination, the first of the witnesses, Kang asserted that he preserved this issue for appellate review. The State, on the other hand, contended that the issue was not preserved because the trial judge never granted expressly a continuing objection.

 Maryland Rule 4–323 sets forth the method of making objections to the admission of evidence in criminal trials. Maryland Rule 4–323(a) states, in part, that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." This is referred to as the contemporaneous objection rule. *See, e.g., Southern Management v. Taha,* 378 Md. 461, 499, 836 A.2d 627, 649 (2003) (Citations omitted). We recognized in some older cases that "[t]o preserve an issue on appeal in regard to the admissibility of evidence, generally speaking there must be an objection made to the question eliciting the allegedly objectionable answer." *Rose v. State,* 240 Md. 65, 69, 212 A.2d 742, 744 (1965) (Citations omitted). Moreover, "[g]enerally speaking, specific objection should be made to each question propounded, if the answer thereto is claimed to be inadmissible." *State Roads Comm. v. Bare,* 220 Md. 91, 94, 151 A.2d 154, 156 (1959). Yet, as the Court of Special Appeals noted in its opinion here, *Kang,* 163 Md.App. at 44, 877 A.2d at 185, "trial advocates were oftentimes obligated to lodge repetitive and disruptive objections, over and over again, even though everyone in the courtroom knew that the objections were going to be overruled."

Consequently, Maryland Rule 4–323(b), adopted in 1984, was created to provide a trial judge with the discretion to grant a continuing objection and thus obviates the need to object persistently to similar lines of questions that fall within the scope of the granted objection: "At the request of a party or on its own initiative, the court *may grant* a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly

within its scope." (Emphasis added). As indicated by the text of the rule, this reprieve from the contemporaneous objection rule is obtained only through a discretionary grant by the trial judge. *See, e.g., Hutton v. State,* 339 Md. 480, 488 n. 6, 663 A.2d 1289, 1292 n. 6 (1995) (noting that the petitioner asked for and was granted a continuing objection during trial); *State v. Brown,* 327 Md. 81, 84, 607 A.2d 923, 924 (1992) (noting that the court explicitly granted a continuing objection); *Wilson v. State,* 87 Md.App. 659, 671–72, 591 A.2d 524, 530 (1991) (setting forth the dialogue with the court in which the defendant was granted a continuing objection).

In the present case, no such explicit grant was made by the court during trial. The following exchange occurred during the direct examination of Pastor Lee, who was the first of the three witnesses in question to testify:

[PROSECUTOR:] Okay. And did she tell you how she got the scar?

[PASTOR LEE:] Yes.

[PROSECUTOR:] What did she tell you?

[DEFENSE COUNSEL:] Objection, Your Honor. That is going to call for hearsay.

[PROSECUTOR:] Your Honor, I offer it as a prior consistent statement.

THE COURT: Hold on a second. I'll overrule and allow him to answer.

[PROSECUTOR:] What did she tell you about how she got the scar?

[PASTOR LEE:] Yes. She told me that what happened to her of that scar—one day, you know, her husband called [her] to their bedroom—

[DEFENSE COUNSEL:] Objection, Your Honor. That is clearly hearsay.

\*　　\*　　\*

[PROSECUTOR:] Let me try to narrow the question ... What did she tell you about how that injury was inflicted?

[PASTOR LEE:] Okay. Mr. Kang asked her to follow him up—

[DEFENSE COUNSEL:] We are going to offer a continuing objection to what she told him and how she got it. This isn't being asked in relation to what anybody else said or anything else consistent.

THE COURT: Well—

[DEFENSE COUNSEL:] We'll do that for the record.

THE COURT: Pastor, if she told you specifically how the scar on her neck occurred, I will allow you to answer that. . . .

\* \* \*

[PROSECUTOR:] Pastor, can you please tell us what Mrs. Kang told you about how the scar on her neck occurred?

\* \* \*

[PASTOR LEE:] Her husband told her to come downstairs, which she did, and there was a rope hanging from the ceiling. And she was told to climb up to the step, which she did, thinking that it was some sort of play. But, as soon as she went up, he kicked the step.

[PROSECUTOR:] And what happened? Did she tell you what happened to her after he kicked the step away?

[PASTOR LEE:] That she had no recollection because she fainted.

[PROSECUTOR:] Do you recall whether she told you whether there was any kind of note involved in this incident?

[PASTOR LEE:] Yes.

[PROSECUTOR:] What did she tell you about that?

[DEFENSE COUNSEL:] Your Honor, I am going to object to that. We are now moving from the story that [s]he told h[im] about the rope and now to other aspects of it. So I am going to offer another continuing objection to that.

[PROSECUTOR:] Your Honor, I would argue that this is a prior consistent statement to her testimony in which the defense spent, probably, four hours cross-examining Mrs. Kang, questioning her account of what happened, the logic of it, the credibility of it.

They impeached her, and I am offering this as a prior consistent statement to her testimony.

\* \* \*

THE COURT: I'm going to overrule the objection, and I'll allow him to answer.

Kang may not rely on merely an "offer" of a continuing objection during Pastor Lee's testimony and then forego lodging contemporaneous objections to subsequent related testimony elicited from that witness or subsequent witnesses. *See Hall v. State,* 119 Md.App. 377, 390, 705 A.2d 50, 56 (1998) ("Furthermore, as Professor McLain points out, if the improper line of questioning is interrupted by other testimony or evidence and is thereafter resumed, counsel must state for the record that he or she renews the continuing objection. McLain, *Maryland Evidence,* § 103.12. Otherwise, it would be impossible for an appellate court to determine whether the trial judge regarded the continuing objection as remaining in effect."). For example, as the Court of Special Appeals noted in its opinion here, *Kang,* 163 Md.App. at 43, 877 A.2d at 185, "no objection was asserted when Dr. Kim was asked what Mrs. Kang had told him regarding the cause of her neck injuries, and on cross-examination, defense counsel even asked Dr. Kim to repeat what Mrs. Kang had told him about her neck injuries." Kang argues, in his rely brief, that "[t]he way to achieve th[e] policy [of avoiding constant bickering and arguing on appeal], while safeguarding fairness to *all* of the parties, is to hold that the party making a continuing objection can rely on its effect so long as the trial judge does not expressly deny the request." (Emphasis in original). The language of the Rule places the burden on the party objecting to the evidence to make an objection at the time the evidence is offered unless and until the trial judge grants, in his or her

discretion, a continuing objection. *See* Md. Rule 4–323. Because the continuing objection was not clearly granted on the record by the trial judge, Kang waived any objection to the admissibility of references to Mrs. Kang's prior consistent statements through the testimony of the three witnesses.

JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.

BELL, C.J. and GREENE, J., Dissent.

Dissenting Opinion by BELL, C.J., which GREENE, J., joins in part A.

## A.

A Maryland defendant's right to waive a trial by jury is personal and exercisable only by the defendant himself or herself. *Smith v. State,* 375 Md. 365, 379–81, 825 A.2d 1055, 1064 (2003), *Howell v. State,* 87 Md.App. 57, 77, 589 A.2d 90, 100 (1991). A waiver of that right is effective and valid only if made on the record, in open court, and found by the court to have been made "knowingly and voluntarily." Maryland Rule 4–246(b); *Smith,* 375 Md. at 378–81, 825 A.2d at 1063–1064; *State v. Bell,* 351 Md. 709, 724–25, 720 A.2d 311, 319 (1998); *Tibbs v. State,* 323 Md. 28, 31–32, 590 A.2d 550, 551–552 (1991); *Stewart v. State,* 319 Md. 81, 90, 570 A.2d 1229, 1233–34 (1990); *Martinez v. State,* 309 Md. 124, 131–35, 522 A.2d 950, 953–56 (1987). The factual determination is fact and circumstance specific and has two components: the waiver must be both "knowing" and "voluntary," *Tibbs,* 323 Md. at 31, 590 A.2d at 551, *citing State v. Hall,* 321 Md. 178, 182, 582 A.2d 507, 509 (1990); *Stewart,* 319 Md. at 90, 570 A.2d at 1233–34; *Martinez,* 309 Md. at 134, 522 A.2d at 955.[1] Case law is clear on this point:

---

1. For a waiver to be knowing and voluntary, it must have been, for the possessor of the right, "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). In *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970), the

"[T]he trial court must satisfy itself that the waiver is not a product of duress or coercion, and further that the defendant has some knowledge of the jury trial right before being allowed to waive it."

*Tibbs* at 31, 590 A.2d at 550, *citing Hall,* 321 Md. at 182–83, 582 A.2d at 509.

This Court, faced for the second time in the last year with what seems to me to be a clear cut issue, determining the requirements necessary to be met for a waiver of jury trial by a defendant to be valid,[2] has again chosen to disregard the plain and unambiguous command of the Rule of Court controlling the issue, Rule 4–246, thus continuing a strained, narrow, and illogical interpretation of that Rule, and reinforcing an imprecise and incomplete waiver inquiry. The majority characterizes as "unavailing" the argument by Shin H. Kang, the petitioner, that, because there was no specific inquiry into the voluntariness of his jury trial waiver, the petitioner's waiver of his right to jury trial was invalid. 393 Md. 97, 106, 899 A.2d 843, 848 (2006). This is so, the majority says, because "there is no uniform requirement explicitly to ask a defendant whether his or her waiver decision was induced or coerced, unless there appears some factual trigger on the record, which brings into legitimate question voluntariness.... Kang's colloquy responses did not trigger a requirement that the trial judge inquire further as to voluntariness." 393 Md. at 110, 899 A.2d at 851.

---

Supreme Court elucidated: "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (Footnote omitted).

2. The waiver standard is prescribed by Maryland Rule 4–246(b), which provides:

"*Procedure for Acceptance of Waiver.* A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily."

This rationale is wholly inadequate. I emphatically reject it. How, I ask, can there be any factual trigger on the record when the defendant, who may be under duress or coercion not visible to the court and which he or she may not even appreciate or understand, is never asked questions pertinent to the issue and designed to ferret out information on the subject and, thus, is not given an opportunity to reveal such information? Indeed, unless the trial court asks questions bearing on the subject of the defendant's voluntary relinquishment of his or her right to jury trial, a defendants may not even realize that he or she may volunteer information or that the jury trial waiver colloquy is his or her only opportunity to advise the court of circumstances bearing on the voluntariness of the plea. Is it truly this Court's expectation that defendants operating under coercion or duress, the existence and nature of which they may not even know, can somehow transcend this circumstance and, without prompting or inquiry, asseverate their inability voluntarily to waive their jury trial right?

I had thought, and so stated in dissent in *Abeokuto v. State*, 391 Md. 289, 370, 893 A.2d 1018, 1065 (2006) (Bell, C.J., dissenting), that *Tibbs*, 323 Md. at 31, 590 A.2d at 551, had laid to rest, or at least settled it going forward, the notion that the trial court's obligation, or burden, to satisfy itself that a defendant's waiver of jury trial is voluntary, is satisfied by the absence of evidence, when there is nothing in the record to "trigger" a further factual inquiry. The majority opinion in *Abeokuto*, confirmed by the opinion in this case, makes clear that the majority does not see it that way; despite the clarity of the waiver requirements, as enunciated both by Rule and case law, despite the Court's admonition that both requirements must be satisfied before a waiver will be held to be valid and notwithstanding *Tibbs*, the Court seems intent on continuing to relax the waiver standards in practice, as it previously has repeatedly done.

I continue to be confounded, and am certainly far from reconciled to this approach. Accordingly, I stand by the views expressed in dissent in *Abeokuto:*

"The circumstances in *Tibbs* mirror this case.[3] At no time was the petitioner asked about anything that would impact the voluntariness of his waiver, except, of course, the nature of the jury trial right and the effect of waiver in the context of a death penalty proceeding. That a defendant is aware of, has some knowledge of, the jury trial right, while it may be necessary to a finding of voluntariness, it simply does not

---

3. In *Tibbs v. State*, 323 Md. 28, 590 A.2d 550 (1991), the issue was whether the defendant validly had waived his right to jury trial under Maryland Rule 4–246. Although the defendant had been asked whether "anyone [had] forced you or threatened you to have you give up your right to a jury trial," and whether he was giving up the right "freely and voluntarily," he had only been asked whether he understood what a jury trial was. *Id.* at 30, 590 A.2d at 551. No other inquiry was made and no additional information on the subject was provided. Nevertheless, relying on our precedents stressing that there is no specific litany required for a valid waiver inquiry, the Court of Special Appeals in an unreported opinion concluded that the defendant had knowingly and voluntarily waived his jury trial right, *id.* at 31, 590 A.2d at 551, holding that the defendant's previous experience with the criminal justice system compensated for the absence of questions regarding the defendant's knowledge of the nature of a jury trial.

This Court, in reviewing the Court of Special Appeals' opinion, reaffirmed that a fixed litany was not required; *Id.* at 31, 590 A.2d at 551; however, we made clear that, from the inquiry conducted, the trial court "must satisfy itself that the waiver is not a product of duress or coercion, and further that the defendant has some knowledge of the jury trial right before being allowed to waive it." 323 Md. at 31, 590 A.2d at 551, *citing Hall*, 321 Md. at 182–183, 582 A.2d at 509. Viewing the totality of the circumstances in that light, this Court concluded that "the record is woefully deficient to establish that Tibbs knowingly and voluntarily relinquished his right to a jury trial. The record fails to disclose that Tibbs received any information at all concerning the nature of a jury trial, as required by our cases." 323 Md. at 31, 590 A.2d at 551 (citation omitted). We elaborated:

"It is not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows 'what a jury trial is,' and waives that right 'freely and voluntarily.' Accordingly, notwithstanding that Tibbs may have had some prior unspecified experience with the criminal justice system, the trial judge could not fairly be satisfied on this record that Tibbs had the requisite knowledge of the nature of the jury trial right, that his waiver of the right was knowing and voluntary, and that the requirements of the rule were thus met. We conclude, therefore, that constitutional due process requirements were transgressed in this case."

323 Md. at 32, 590 A.2d at 551–552.

address directly the motivation issue and it certainly does not inform the court as to it. Whether a person has been coerced or induced to act, whether physically, mentally, by promise or otherwise, ordinarily is not readily, and may not be at all, observable. ... As in *Tibbs*, there is in this case nothing whatsoever on which the trial court could have relied to determine, as it must have done, that the petitioner's jury trial waiver was not the product of duress or coercion. The majority's reliance on the absence of facts in the record demonstrating that the court had a reason to ask questions going to the voluntariness of the waiver is, therefore, quite curious. Nor can the fact that the petitioner was represented by counsel provide the necessary basis for the voluntariness determination."

*Id.* at 370–371, 893 A.2d at 1065.

What I said in that dissenting opinion applies with equal force to the case *sub judice*, perhaps even with greater force. If the prior experience with the criminal justice system that a defendant might have, evidenced by the criminal record he or she has amassed, can not substitute for facts from which the requisite knowledge of the nature of a jury trial can be inferred, the trial court being prohibited from relying on its own observations and conclusions for that inference, it necessarily must follow that the absence of facts concerning voluntariness can not supply the basis upon which the court can, using its own observations and knowledge, infer that a defendant's waiver of jury trial is voluntary. While there is a certain amount logic in inferring from past experience a degree of knowledge, there is no such logic when the predicate for the inference is the absence of any evidence on the subject, when "there is ... nothing whatsoever on which the trial court could have relied to determine, as it must have done, that the petitioner's jury trial waiver was not the product of duress or coercion." 391 Md. at 370–371, 893 A.2d at 1065.

Nor is there an inconsistency between the fact that there is no fixed litany that must be followed in complying with Rule 4–246 and requiring that, at a minimum, there must be some inquiry into the voluntariness of the waiver, just as there must

be with respect to the defendant's knowledge of the jury trial right. Just as "[i]t is not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows 'what a jury trial is,' and waives that right 'freely and voluntarily,'" *Tibbs*, 323 Md. at 32, 590 A.2d at 551, it cannot be sufficient, under *Tibbs*, for the trial judge to "observe" that there was, during the jury trial waiver colloquy, no physical nor verbal manifestation of duress or coercion. I interpret the *Tibbs* admonition that the trial court must satisfy itself both that the waiver was voluntary and that it was done knowingly as being active, not passive. Thus, something more than looking for a "factual trigger" is required; the court has a duty to inquire, to direct the defendant's attention to, and probe, at least minimally, the relevant considerations. It is worth repeating:

"We can not forget that coercion and improper inducements may have many sources. Indeed, it is not unheard of that a defendant's attorney may be the source of an improper inducement. To be sure, we can speculate that counsel properly advised the petitioner about his jury trial right and satisfied himself that the defendant's decision was not the result of coercion, duress or promises. Moreover, we may also surmise that counsel did not himself do anything to coerce or improperly induce the waiver. As with the knowledge prong, see *Tibbs*, that is not sufficient. Nor is it uncommon that disclosure of such inducements is made, if at all, only upon direct inquiry, perhaps because of the nature of the proceedings-the defendant is responding to questions and likely does not know that he should, or is expected to, volunteer information. Expecting the defendant to volunteer the information or, at least signal that there may be matters that may call into question the voluntariness of the defendant's announced decision, without explicitly advising him of the consequences of not doing so, therefore, is, I submit, most unrealistic. In any event, it is the court's burden to satisfy itself that the waiver is voluntary, not the defendant's. The absence of evidence hardly seems an

appropriate or adequate basis on which to meet that burden."

391 Md. at 371, 893 A.2d at 1065–1066 (Bell, C.J., dissenting).

I am not persuaded by the majority's contrasting of this case with *Martinez v. State*, 309 Md. 124, 522 A.2d 950 (1987). In that case, the trial court determined that the defendant's waiver of jury trial was knowing and voluntary, despite the defendant having answered "yes" to the question whether he had been made promises or been threatened with respect to his jury trial right, and responded, "just the judge" when asked if he were certain that his decision to waive jury trial was made freely and voluntarily. Noting the defendant's affirmative response to the coercion question, this Court concluded that it did not support the trial court's finding that the waiver was voluntary. The majority seizes upon this fact as supporting its position: "[i]n contrast to the circumstances in *Martinez*, Kang's responses did not trigger a requirement that the trial court inquire further as to voluntariness." 393 Md. at 110, 899 A.2d at 851.[4] The majority's comparison of the petitioner's circumstances to that of the defendant in *Martinez* is wholly inappropriate. In *Martinez*, there was an inquiry into the voluntariness of the defendant's election; it was the answer to that inquiry that was the trigger for further inquiry and which, when further inquiry was not pursued, constituted the reason for the reversal of the conviction in that case. There was no such inquiry into the voluntariness of the election in this case. If *Martinez* has any contribution to make to the resolution of the issue *sub judice*, it is to demonstrate that questions aimed at determining whether coercion or duress played any role in the defendant's waiver decision are necessary and crucial, as such an inquiry provides the trial judge a window into the defendant's thought process.

---

4. The majority made a similar comparison in *Abeokuto v. State*, 391 Md. 289, 324, 893 A.2d 1018, 1038 (2006). In that case, it observed, "the trial judge did not ignore an affirmative answer to a question aimed at coercion and duress."

Notwithstanding that the contrast is inapt, comparing apples to oranges, it does identify the fundamental flaw in the majority's analysis. Ignoring an answer to a question into voluntariness, when the answer would require a result contrary to the one the trial court reached, is far different from refraining from asking a question on the subject because no "factual trigger" for such a question has been presented. Rather than being required to satisfy itself of the voluntariness of the defendant's waiver decision, pursuant to this analysis, the trial court need only wait for the defendant to provide a basis for concern; its only obligation with respect to voluntariness is *reactive*, not active. Because, however, there is no requirement that the court explore issues implicating voluntariness, except, of course, to the extent that the knowledge prong does so, the likelihood that further inquiry along those lines will ever be triggered is, at best, remote. Indeed, the only occasion when the trigger will be engaged will be when the defendant volunteers information; if he or she does not volunteer any information bearing on the voluntariness of the waiver decision, *ipso facto*, there is no "factual trigger" for inquiry into the matter.[5]

The majority claims that "[w]hile the inquiry in the present case is not clothed in the finest cashmere, the colloquy conducted by the trial judge is certainly not a 'naked' inquiry as

---

5. I pointed out in *Abeokuto*, relevant to this issue,

 "The Court was not unaware of the tenuousness of relying on a record that was not developed fully as to all aspects of the waiver construct. In *Dortch v. State*, 290 Md. 229, 428 A.2d 1220 (1981), taking note of the fact that many trial judges inquired specifically into the motivation of defendants who waived jury trials, the Court pronounced that to be the preferable practice and 'encourage[d] trial judges to engage persons electing court trials in a dialogue as detailed as time, resources and circumstances permit so as to insulate jury trial waivers from successful direct or collateral attack.' *Id.* at 236, 428 A.2d at 1224, *quoting Davis v. State*, 278 Md. 103, 118, 361 A.2d 113, 121 (1976). We reiterated that encouragement in *Hall*, in light of our recognition 'that the cold record before us does not reflect a defendant's demeanor, tone, facial expressions, gestures, or other indicia which, to a trial judge, may be indicative of a knowing and voluntary waiver of the jury trial right.' "
*Id.* at 183–84, 582 A.2d at 510.

in *Tibbs."* 393 Md. at 111, 899 A.2d at 851. I disagree as to both prongs.

The waiver colloquy that occurred in this case was as follows:

"[DEFENSE COUNSEL]: Your Honor, the only other issue that I had was that I just wanted to put on the record that Mr. Kang had agreed with the waiver of the jury trial.

"THE COURT: All right. Let me just briefly voir dire Mr. Kang in that regard.

"THE COURT: Mr. Kang, you have an absolute right to a trial by jury in this matter. You also have the right to choose a trial by a judge. In this case, it would be myself.

"Do you understand that if you had a trial by a jury, there would be 12 men and women chosen from the community and your attorney would be able to participate in the selection of that jury and that jury would decide your guilt or innocence of the charges?

"Do you understand that?

"A: Yes.

"THE COURT: Do you understand that if you had a trial by a jury, before you could be convicted by a jury, all 12 jurors would have to unanimously agree upon your guilt? Just for the record, you do understand that?

"A: Yes, I understand.

"THE COURT: And just by way of example, if you had a jury trial and 11 jurors wanted to convict and one juror did not, you would not be convicted. Do you understand that?

"A: Yes.

"THE COURT: And is it your decision to waive the jury trial and elect to have a trial before me today in this court?

"A: Yes.

"THE COURT: Very well. I am satisfied that Mr. Kang has knowingly and voluntarily waived his right to a trial by a jury."

I am satisfied that, as to the defendant's knowledge of the jury trial right, the colloquy was quite satisfactory. Indeed, in the parlance of the majority, that prong of the inquiry may even be characterized as being "clothed in the finest cashmere." To the extent that inquiry was intended to do double duty, to be an inquiry into the voluntariness of the waiver, however, it is not a question of the quality of the cashmere, but one of whether the inquiry was clothed at all. Because the colloquy contained no questions with regard to whether the defendant was acting voluntarily, without coercion or duress, on that issue, it was, in fact, worse than "a naked inquiry." Furthermore, as already explained, the inquiry was an inadequate opportunity for a "factual trigger," as the majority has labeled it, to even emerge.

Again, the petitioner was never asked about anything regarding the voluntariness of his waiver, except, to the extent relevant, his knowledge of the jury trial right. To be sure, that knowledge may play some role in a finding of voluntariness. It cannot provide, however, the entire picture. Mental or physical coercion, by promise or other means, is not readily observable. Nothing on the record supports the majority's conclusion that the petitioner's waiver of jury trial was not the product of duress or coercion. There was no prior written waiver as in *Dortch* or *Hall* to further reinforce the notion that the petitioner waived his right voluntarily. The absence of facts is an insufficient predicate for a voluntariness determination.

### B.

There is another reason for my disagreement with the majority. That reason involves the problem associated with the petitioner's interpreter.

The record indicates that, before the commencement of the petitioner's trial, a court appointed interpreter, requested by the petitioner, was present and sworn. Presumably, the ap-

pointment was pursuant to Maryland Rule 1–202(a)(2),[6] which requires the appointment of an interpreter for a defendant who "cannot readily understand or communicate the English language and cannot understand a charge made against the defendant or help present the defense." This is made necessary by the critical importance under our system that a defendant charged with a crime is able meaningfully to confront his or her accusers and to understand, and thus participate meaningfully in, the proceedings. *See Biglari v. State,* 156 Md.App. 657, 665, 847 A.2d 1239, 1244 (2004), *citing Ko v. United States,* 722 A.2d 830, 834 (D.C.1998) (noting that the ability to understand proceedings is essential to a defendant's right to a fair trial). The appointment of an interpreter for a defendant not proficient in the English language, or readily so, recognizes, in other words, that

> "In the absence of a court interpreter, many persons who come before the courts are partially or completely excluded from full participation in the proceedings because they have limited proficiency in the English language, have a speech impairment, or are deaf or hard of hearing. It is essential that the resulting communication barrier be removed, as far as possible, so that these persons are placed in the same position and enjoy equal access to justice as similarly situated persons for whom there is no such barrier."

*See* Maryland Rules, Appendix: Maryland Code of Conduct for Court Interpreters, Preamble. Court appointed interpreters are *officers of the court,* whose function is to "help to ensure that ... persons [needing and utilizing their services] enjoy equal access to justice and that court proceedings and

---

**6.** Md.Code (1957, 2001 Repl.Vol., 2005 Supp.), Criminal Procedure Article § 1–202 provides, as relevant:

" § 1–202. Interpreters for criminal proceedings.

"(a) *When appointment required.*—The court shall appoint a qualified interpreter to help a defendant in a criminal proceeding throughout any criminal proceeding when the defendant is:

"(1) deaf; or

"(2) cannot readily understand or communicate the English language and cannot understand a charge made against the defendant or help present the defense."

court support services function efficiently and effectively."
*See* Maryland Rules, Appendix: Maryland Code of Conduct
for Court Interpreters, Preamble. Thus, interpreters work
for the courts; they are not agents of the defendant or the
defense counsel. This is confirmed by the oath that an
interpreter is required to take. Maryland Rule 16–819(d)(3),
which governs the oath taken by interpreters, provides:

> "*Oath.* Upon appointment by the court and before acting as
> an interpreter in the proceeding, the interpreter shall sol-
> emnly swear or affirm under the penalties of perjury to
> interpret accurately, completely, and impartially and to
> refrain from knowingly disclosing confidential or privileged
> information obtained while serving in the proceeding."

To be sure, as the majority accurately notes, an interpreter
is under no obligation always to provide a "simultaneous,
word-for-word translation." 393 Md. at 118, 899 A.2d at 855,
*citing* Maryland Rules, Appendix: Maryland Code of Conduct
for Court Interpreters, Canon 1, Accuracy and Completeness,
Commentary. What the majority fails to state is that the
applicability of that statement assumes that, to do so, would
"distort the meaning of the source language," in which event,
it is the opposite obligation that obtains: the interpreter shall
not provide such "[v]erbatim, 'word for word' or literal oral
interpretations." It is clear, on the other hand, that once
appointed by the court and sworn, "[i]nterpreters shall render
a complete and accurate interpretation or sight translation,
without altering, omitting, or adding anything to what is
stated or written and without explanation."[7] Maryland Rules,
Appendix: Maryland Code of Conduct for Court Interpreters,
Canon 1, Accuracy and Completeness. In short, the interpret-
er is not free to choose when to interpret, nor is he or she free

---

7. It is curious that the majority can "presume that the Korean–English
interpreter 'interpret[ed] accurately, completely, and impartially' as
required in the oath taken by interpreters" when the interpreter ac-
knowledged, during the various inquiries made by the court, the incom-
pleteness of the interpretation being given. 393 Md. at 113–14, 899
A.2d at 852–53.

to omit interpretation of certain statements or parts of the proceedings, despite representations by the party for whose benefit he or she was retained, in this case, the defendant, that full interpretation is not necessary. The interpreter's oath makes this crystal clear, Rule 16–819(d)(3), and that was clearly our intent when we adopted the Code of Conduct for Court Interpreters. *See* Maryland Rules, Appendix: Maryland Code of Conduct for Court Interpreters, Canon 1, Accuracy and Completeness, Commentary (emphasis added):

> "The interpreter has a twofold duty: 1) to ensure that the proceedings reflect precisely what was said, and 2) to place the person with limited English proficiency on an equal footing with those who understand English. This creates an obligation to conserve every element of information contained in a source language communication when it is rendered in the target language.

> "Therefore, interpreters are obligated to apply their best skills and judgment to preserve faithfully the meaning of what is said in court, including the style or register of speech. Verbatim, 'word for word,' or literal oral interpretations are not appropriate *if* they distort the meaning of the source language, *but every spoken statement, even if it appears non-responsive, obscene, rambling, or incoherent, should be interpreted. This includes apparent misstatements.*

> "Interpreters should never interject their own words, phrases, or expressions. If the need arises to explain an interpreting problem (e.g., a term or phrase with no direct equivalent in the target language or a misunderstanding that only the interpreter can clarify), the interpreter should ask the court's permission to provide an explanation. Interpreters should convey the emotional emphasis of the speaker without reenacting or mimicking the speaker's emotions or dramatic gestures.

\* \* \* \* \* \*

"The obligation to preserve accuracy includes the interpreter's duty to correct any error of interpretation discovered by the interpreter during the proceeding."

In order for interpreters to perform fully under their "obligation to preserve accuracy," nothing should, or can, be omitted, whatever the desire or insistence of the defendant. As indicated, this is clear from our Rules.

It is undisputed that the court appointed interpreter, appointed at the behest of the petitioner, at various times during the proceedings did not interpret the proceedings. Rather than insisting that the interpreter perform as the interpreter's oath requires, the court sought and received assurances from the petitioner and his counsel that the interpretations were unnecessary and that the petitioner understood what was going on. On appeal, the petitioner argues that the trial judge neither "ma[d]e any efforts to ascertain whether [the petitioner] understood the nature of the rights he was waiving" nor "ma[d]e sure that the proceedings were translated from English to Korean."

The majority rejects both of the petitioner's arguments. 393 Md. at 110–11, 899 A.2d at 851. It rationalizes, as to the first, that the petitioner demonstrated adequate knowledge of his right to jury trial because he was able to answer in the affirmative to the "byte-size" pieces of questions that were being asked of him. 393 Md. at 111–12, 899 A.2d at 851–52. With respect to the second, it points to the inquiries that the trial judge made to ascertain why the proceedings were not being interpreted and the trial judge's conclusion that the interpretation was not necessary, as the petitioner, confirmed by his counsel, acknowledged understanding the matters that were not interpreted. It also points out that both the petitioner and his counsel professed satisfaction with the interpreter. I am not convinced.

It may be that the trial court did make efforts, albeit inadequate, given the quality of the waiver inquiry, to ascertain whether the petitioner understood the rights he was waiving. It certainly made a number of inquiries after learn-

ing that the interpreter was not interpreting. It is important, however, to remember that, in addition to the inadequacy of the waiver inquiry, as I have demonstrated, if the petitioner did not fully understand what was being said to him, it is irrelevant how small the questions are broken down into.

However much the trial court may have inquired as to the reasons for the non-interpretation and no matter how satisfied the petitioner and the defense counsel professed to be with the job done by the interpreter,[8] it cannot be contended seriously that the court made sure that all of the proceedings were interpreted from English to Korean. The court simply did not insist that the interpreter follow the Rules and, of course, by not interpreting all of the proceedings, albeit, we must assume, at the behest of the petitioner, the interpreter, in fact, violated the Rules. The majority does not seriously contend otherwise. Rather, it relies on the fact that the petitioner and his counsel acknowledged authorizing the non-interpretation for the reason that the petitioner understood the portions of the proceedings that were not interpreted.

This is beside the point. The petitioner sought and received appointment of an interpreter, presumably because he needed an interpreter and because the requisite showing in that regard was made. Once the interpreter was in the case, it was clearly required that the interpreter perform in conformance with the Rules and it was the trial court's responsibility to enforce that compliance. That is true whether or not the petitioner and his counsel were willing to accept less. While it is for the defendant's benefit that the interpreter was appointed, it can not be forgotten that the court appointment also served an important institutional purpose, one that implicates the integrity of the criminal process, to ensure that the defendant has equal access and also to ensure that "court proceedings and court support services function efficiently and effectively."

---

8. The number and frequency of the inquiries as to why there was a lack of interpretation are themselves troublesome to me.

Nor am I satisfied by the fact that, as the majority notes, "[the petitioner] has been an employee of the U.S. Postal Service for 17 and ½ years; [the petitioner] proclaimed that he spoke English '[w]ell' but 'not very well;' [the petitioner's] attorney described to the court that '[the petitioner] understand[s] English fairly well . . . .;' and, in fact, during trial, [the petitioner] answered some of the State's questions during cross-examination using English." 393 Md. at 117–18, 899 A.2d at 855. Length of employment is not dispositive of one's proficiency in understanding English. The petitioner's attorney, moreover, cannot be the standard for determining how well the petitioner understands English, even when the petitioner appears to speak English with some ability. After all, it was presumably the petitioner's attorney who asked that the interpreter be appointed. Indeed, that the petitioner only answered "some of the State's questions . . . using English" only further highlights the fact that complete interpretation was necessary and should have been required.

Similar to coercion or duress, a non-English speaking defendant's lack of understanding of what was being said during the jury trial waiver litany or at any other point in the trial is sometimes not readily observable by the trial court. It is possible that someone who has lived in the United States for more than 17 years has learned how to act and react to situations, even those beyond their comprehension, in order to avoid difficulty. Such behavior may not ever be admitted or discovered, even in court. Therefore, it is crucial that, when the decision has been made that an interpreter is required, all efforts be made to ensure that the interpreter does what the court appointed him or her to do—interpret all relevant proceedings so that it is clear, and objectively verifiable, in fact, that all relevant information is communicated to the defendant. The duty to ensure that this is done is the trial court's. That duty was not discharged in this case.

I would reverse.

Judge GREENE joins in the views expressed herein in part A.